Ex parte GRIFFIN.

(District Court, N. D. New York. December 2, 1916.)

*(Syllabus by the Court.)*

1. CITIZENS ⚖══13—EXPATRIATION.

A citizen of the United States, who with his family goes to Canada, and there later enlists in the army of that country for oversea service, making the necessary declarations, and takes an oath of allegiance that he will be faithful and bear true allegiance to His Majesty King George the Fifth, his heirs and successors, and that he will as in duty bound honestly and faithfully defend His Majesty, his heirs and successors, in person, crown, and dignity, against all enemies, and will observe and obey all orders of His Majesty, his heirs and successors, and of all the generals and officers set over him, so help him God, and actually enters the service, thereby effectually expatriates himself under the provisions of 2 U. S. Comp. Stat. 1913, § 3959, p. 1591, Act March 2, 1907, c. 2534, § 2, 34 Stat. 1228, which declares that "any American citizen shall be deemed to have expatriated himself when he has been naturalized in any foreign state in conformity with its laws or when he has taken an oath of allegiance to any foreign state," etc. Expatriation is complete, even if, after a few days' service, he deserts and surreptitiously returns to the United States.

[Ed. Note.—For other cases, see Citizens, Cent. Dig. §§ 20–22; Dec. Dig. ⚖══13.]

2. ALIENS ⚖══46—DEPORTATION—EXPATRIATED CITIZEN.

Such person, by such acts, if voluntary, not only abandons and renounces his citizenship in the United States, but becomes an alien, and by such removal, enlistment, and oath of allegiance to a foreign power initiates naturalization in such foreign country and comes under its protection. Therefore, when he thereafter deserts such service and surreptitiously returns to the United States, not coming through any port of entry, he comes in violation of law, and may be deported under the provisions of section 36 of Immigration Act Feb. 20, 1907, c. 1134, 34 Stat. 908 (Comp. St. 1913, § 4285), which provides that "all aliens who shall enter the United States except at the seaports thereof, or at such place or places as the Secretary of Labor may from time to time designate, shall be adjudged to have entered the country unlawfully and shall be deported as provided by sections twenty and twenty-one of this act: Provided, that nothing contained in this section shall affect the power conferred by section thirty-two of this act upon the Commissioner General of Immigration to prescribe rules for the entry and inspection of aliens along the borders of Canada and Mexico."

[Ed. Note.—For other cases, see Aliens, Cent. Dig. § 105; Dec. Dig. ⚖══46.]

3. CITIZENS ⚖══13—EXPATRIATION—CONSENT—"FOREIGN STATE"—OATH OF ALLEGIANCE.

Such oath of allegiance to the king of Great Britain is an oath of allegiance to a "foreign state" within the meaning of the statute, and even if the consent of the United States and of such person is necessary to complete expatriation, the necessary consent is found in the statute and the

⚖══For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

voluntary acts of such person. Mackenzie v. Hare, 239 U. S. 299, 36 Sup. Ct. 106, 60 L. Ed. 297.

[Ed. Note.—For other cases, see Citizens, Cent. Dig. §§ 20–22; Dec. Dig. ☜13.

For other definitions, see Words and Phrases, Second Series, Foreign State.]

4. ALIENS ☜46—DEPORTATION—EXPATRIATED CITIZEN.

The petitioner, born in the United States and residing in New York, went with his family to Gananoque, Canada, June 30, 1916, enlisted in the Canadian army for oversea service July 15, 1916, and took the oath of allegiance, deserted August 5, 1916, and surreptitiously returned to the United States August 6, 1916. *Held*, that he had voluntarily expatriated himself and was an alien, and was subject to deportation as such.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. § 105; Dec. Dig. ☜46.]

5. CITIZENS ☜13—EXPATRIATION—OATH OF ALLEGIANCE.

The fact that the enlistment was for "one year or during the war" between England and Germany and six months thereafter did not change the effect of taking the oath of allegiance, which contained no limitation.

[Ed. Note.—For other cases, see Citizens, Cent. Dig. §§ 20–22; Dec. Dig. ☜13.]

*(Additional Syllabus by Editorial Staff.)*

6. CITIZENS ☜13—"EXPATRIATION."

"Expatriation" is the voluntary renunciation of citizenship; the renouncing allegiance to one's own government, usually accompanied by forsaking one's own country.

[Ed. Note.—For other cases, see Citizens, Cent. Dig. §§ 20–22; Dec. Dig. ☜13.

For other definitions, see Words and Phrases, First and Second Series, Expatriate.]

Petition by Edward Dempster Griffin for a writ of habeas corpus. Dismissed.

This is an application by Edward Dempster Griffin, who claims to be a citizen of the United States, for his release from the custody of the immigration officers of the United States, who seek his deportation to Canada on the ground that he (Griffin) is not a citizen of the United States, or entitled to be in the United States, but is a deserter from the British army, he having voluntarily expatriated himself, by voluntarily removing to the Dominion of Canada with his family and then and there voluntarily enlisting in the 156th Overseas Battalion, Canadian Expeditionary Force, and by complying with the laws of Canada, and by taking the oath of allegiance to His Majesty King George the Fifth, king, etc., after which, and after a few weeks' or days' service, he deserted such service and surreptitiously came into the United States, where he was apprehended.

John O'Leary, of Clayton, N. Y., for petitioner.

D. B. Lucey, U. S. Atty., of Ogdensburg, N. Y., for the United States.

RAY, District Judge. The questions involved are important, especially for the reason, if a citizen of the United States by voluntarily

going to Canada and there enlisting in its army and taking the oath of allegiance to the king of England and serving in such army does not lose his citizenship in the United States, he may serve in the English army for months and perhaps years, sustain injuries in such service which forever totally disable him from earning a support for himself or family, and then return to the United States and here become a public charge. There is before this court an original paper, the authenticity of which is not questioned, as follows:

Attestation Paper. No. 640184

156th Overseas Battalion, C. E. F.

Canadian Overseas Expeditionary Force.

Questions to be Put before Attestation.

(Answers.)

1. What is your surname? Griffin.
1a. What are your Christian names? Edward Dempster.
1b. What is your present address? Gananoque.
2. In what town, township, or parish, and in what country, were you born? Adams, Jefferson Co., U. S.
3. What is the name of your next of kin? Abia Griffin.
4. What is the address of your next of kin? Gananoque.
4a. What is the relationship of your next of kin? Wife.
5. What is the date or your birth? Nov. 3rd, 1873.
6. What is your trade or calling? Farmer.
7. Are you married? Yes.
8. Are you willing to be vaccinated or revaccinated and inoculated? Yes.
9. Do you now belong to the active militia? Yes.
10. Have you ever served in any military force? Yes. (If so, state particulars of former service.)
11. Do you understand the nature and terms of your engagement? Yes.
12. Are you willing to be attested to serve in the Canadian Overseas Expeditionary Force? Yes, for artillery.

Declaration to be Made by Man on Attestation.

I, Edward Dempster Griffin, do solemnly declare that the above are answers made by me to the above questions, and that they are true, and that I am willing to fulfill the engagements by me now made, and I hereby engage and agree to serve in the Canadian Overseas Expeditionary Force, and to be attached to any arm of the service therein, for the term of one year, or during the war now existing between Great Britain and Germany, should that war last longer than one year, and for six months after the termination of that war, provided His Majesty should so long require my services, or until legally discharged.        E. D. Griffin.    [Signature of Recruit.]
                                    R. W. Wood.    [Signature of Witness.]

Date, July 14th, 1916.

Oath to be Taken by Man on Attestation.

I, Edward Dempster Griffin, do make oath, that I will be faithful and bear true allegiance to His Majesty King George the Fifth, his heirs and successors, and that I will as in duty bound honestly and faithfully defend His Majesty, his heirs and successors, in person, crown, and dignity, against all enemies, and will observe and obey all orders of His Majesty, his heirs and successors, and of all the generals and officers set over me. So help me God.
                              E. D. Griffin.    [Signature of Recruit.]
                              R. W. Wood.    [Signature of Witness.]

Date, July 14th, 1916.

Certificate of Magistrate.

The recruit above named was cautioned by me that if he made any false answer to any of the above questions he would be liable to be punished as provided in the Army Act.

The above questions were then read to the recruit in my presence.

I have taken care that he understands each question, and that his answer to each question has been duly entered as replied to, and the said recruit has made and signed the declaration and taken the oath before me at Bannfield, this 14th day of July, 1916.

T. C. D. Bedell, Lt. Col. [Signature of Justice.]

On the back thereof is Griffin's descriptive list, certificate of medical examination, and certificate of the officer commanding unit, which last certificate reads as follows:

Edward Dempster Griffin, having been finally approved and inspected by me this day, and his name, age, date of attestation, and every prescribed particular having been recorded, I certify that I am satisfied with the correctness of this attestation.       T. C. D. Bedell.  [Signature of Officer.]
Date, July 17th, 1916.

The petitioner does not deny that he gave the information contained in this paper, or that he signed the declaration and oath July 14, 1916, but contends, first, that if he did do so intelligently and voluntarily he did not thereby expatriate himself and lose his citizenship in the United States; and, second, that he was so intoxicated when he enlisted in such Canadian service and executed such papers that he did not know and understand what he was doing, or the nature and character of his acts, and is not bound thereby; that when he became sober and possessed of his faculties he left the service and Canada at the first opportunity and returned to the United States.

At this time we will consider the effect of the acts above set forth on the assumption they were voluntary and knowingly and intelligently done. If, when so done, such acts did not amount to expatriation and loss or deprivation of his citizenship in the United States, he is illegally held by the immigration officers and cannot be deported as an alien. If such acts, assuming they were knowingly, intelligently, and voluntarily done, did amount to expatriation and loss of citizenship in the United States, then evidence will be taken on the question of Griffin's mental and physical condition at the time of his enlistment and at the time he took the oath above quoted.

[1, 4] There can be no serious question that the acts of Griffin, assuming such acts were knowingly and voluntarily done, amounted to expatriation and loss of citizenship in the United States. The Congress of the United States has expressly affirmed and declared the natural and inherent right of a citizen to expatriate himself. R. S. U. S. § 1999, 2 U. S. Comp. St. 1913, § 3955, p. 1589; Act July 27, 1868, c. 249, § 1, 15 Stat. 223. That act declares as follows:

"Whereas, the right of expatriation is a natural and inherent right of all people, indispensable to the enjoyment of the rights of life, liberty, and the pursuit of happiness; and whereas in the recognition of this principle this government has freely received emigrants from all nations, and invested them with the rights of citizenship; and whereas it is claimed that such American citizens, with their descendants, are subjects of foreign states, owing allegiance to the governments thereof; and whereas it is necessary to the main-

·' tenance of public peace that this claim of foreign allegiance should be promptly and finally disavowed: Therefore any declaration, instruction, opinion, order, or decision of any officer of the United States which denies, restricts, impairs, or questions the right of expatriation, is declared inconsistent with the fundamental principles of the republic."

The common-law rule of England is that once a citizen always a citizen, and that no citizen can expatriate himself, except with the consent of his sovereign or government. 1 Bl. Com. 369. At one time this was recognized as the law in the United States. Talbot v. Jansen, 3 Dall. 133, 1 L. Ed. 540; U. S. v. Gillies, Fed. Cas. No. 15,206, 1 Pet. C. C. 159; 2 Kent, 49; The Fifteenth Amendment, Brannon, 20, 21; opinion of Chief Justice Fuller in U. S. v. Wong Kim Ark, 169 U. S. at page 711, 18 Sup. Ct. 456, 42 L. Ed. 890; 7 Cyc. 144, and cases cited note 37. But at an early day the courts of the United States, both state and federal, began to question and repudiate this doctrine. 7 Cyc. 144, and cases cited. "The consent of the United States is not necessary to enable a citizen thereof to expatriate himself and become a citizen of another country." Jennes v. Landes (C. C.) 84 Fed. 73.

Not only has Congress recognized and declared this "natural and inherent right of expatriation" without the express consent of the government, but it has also enacted that *"any American citizen shall be deemed to have expatriated himself* when he has been naturalized in any foreign state in conformity with its laws, *or when he has taken an oath of allegiance to any foreign state:* * * * Provided also, that no American citizen shall be allowed to expatriate himself when this country is at war." 2 U. S. Comp. St. 1913, § 3959, p. 1591; Act March 2, 1907, c. 2534, § 2, 34 St. 1228. The king of England is "the state," and England is a "foreign state." It is perfectly clear that Griffin went into a foreign country, represented himself as residing at Gananoque with his wife, and regularly enlisted in the Canadian army, and subscribed and took the oath of allegiance to the king of Great Britain, a foreign state and government. This was complete expatriation, and so declared by the act of Congress above quoted. Mackenzie v. Hare, 239 U. S. 299, 36 Sup. Ct. 106, 60 L. Ed. 297.

In "The Fourteenth Amendment," by Brannon, page 20, citing Santissima Trinidad, Fed. Cas. No. 2,568, 1 Brock. (U. S.) 478, it is said:

"Federal citizenship is lost by expatriation; the citizen by it becomes an alien, and loses all rights adhering to him as a citizen, and is released from his obligations as such."

In Comitis v. Parkerson (C. C.) 56 Fed. 556, 559, it was held that:

"Expatriation can be effected only in accordance with law [and that] under our government Congress must be the source of that law."

This cannot be sound law if expatriation be a natural and inherent right, as Congress says it is; but, assuming it to be true, this petitioner went to Canada with his family, enlisted in a foreign army, and took an oath of allegiance to a foreign government, or state, and thereby expatriated himself by a course of conduct and the doing of acts which an act of Congress says is all-sufficient and effectual to constitute expatriation.

237 F.—29 ·

The United States has always insisted that a citizen of a foreign country has the natural and inherent right to leave that country, emigrate to the United States, and become a resident and a *citizen* here on compliance with our naturalization laws, regardless of the wishes or consent of the government from which he came. If such be the natural and inherent right of an Englishman, it is difficult to understand why it is not the natural and inherent right of a citizen of the United States.

[3] The right of expatriation has constantly been recognized by the federal Department of State, and those citizens of the United States who have taken upon themselves a foreign allegiance are denied the protection due American citizens. Steinkauler's Case, 15 Op. Attys. Gen. 15; Right of Expatriation, 9 Op. Attys. Gen. 356, 362; Id., 8 Op. Attys. Gen. 139.

[6] Expatriation is the voluntary loss or abandonment, or, more properly speaking, renunciation, of citizenship. This may be a completed act, and complete in its effect as to the status of a person, even if he has not become naturalized in some other country according to its laws. Persons born in the United States, subject to its jurisdiction, are citizens of the United States. If one of these persons goes to England and is there naturalized, he becomes a citizen of England, regardless of the wishes or consent of the United States. He is exercising a natural and an inherent right, says the Congress of the United States. In such case he loses his citizenship in the United States on becoming a naturalized citizen of England. This is distinguished from expatriation, which may consist solely in the abandonment and renunciation of citizenship in the United States, without being naturalized in some other country. Of course, a citizen of the United States expatriates himself when he voluntarily goes to England, and there applies for citizenship and becomes naturalized. He has not only abandoned, but renounced, his citizenship in the United States, and become a citizen of another country. Suppose a citizen of the United States abandons his residence here and goes to some foreign country, which has no naturalization laws or procedure, and there settles and conforms to its laws in all respects as a citizen thereof, and declares his purpose to remain, and the Congress of the United States by statute declares that such acts constitute expatriation; can it be said that such person remains a citizen of the United States because he has not been naturalized by such foreign government, and that he may claim and be entitled to the protection of the government of the United States as a citizen thereof? Expatriation is renouncing allegiance to one's own government, accompanied usually by forsaking his own country. In Stoughton v. Taylor, Fed. Cas. No. 7,558, 2 Paine, 562, it was held that an American citizen, by emigrating to a foreign country and entering its military service, completely renounced his American citizenship and was no longer held to its obligations. Can a person owe allegiance to two different absolute and independent governments at the same time? Clearly not. 1 Bl. Com. 370.

There may be a limited and qualified allegiance, of course. A citizen of the United States owes to his government full, complete, and true allegiance. He may renounce and abandon it at any time. This

is a natural and an inherent right. When he goes abroad on a visit or for travel, he must, while abroad, obey the laws of the foreign country, where he is temporarily. In this sense and to this extent only he owes a sort of allegiance to such government, but to no extent and in no sense does this impair or qualify his allegiance or obligations to his own country or to his own government. But if, when abroad, he enters the military service of the foreign government where he is, and there makes oath that he "will be faithful and bear true allegiance" to such foreign government, and "as in duty bound honestly and faithfully defend" such foreign government "against all enemies, and will observe and obey all orders of" such foreign government, etc., he has taken on himself duties and obligations absolutely inconsistent and at war with the duties he owes the home country and government he left, and he has also shown an unequivocal intent to remain abroad. By a change of mind, finding such service irksome and unpleasant, and by desertion from such foreign military service and surreptitious return to the United States, may be rehabilitate and reinstate himself as a citizen of the United States, in face of the statute quoted? In short, by unequivocal acts may he completely expatriate himself the one week and restore himself the next, with all the rights of a citizen? Aliens can only become citizens of the United States by compliance with our laws. Our naturalization statutes prescribe the mode, but the act of March 2, 1907, has a special provision applicable to a woman who marries an alien. There is no provision applicable to a male person who expatriates himself, except our naturalization laws. Is the United States to protect as citizens those who enter a foreign military service, and take an oath of allegiance to such foreign government, and then desert? Does not public policy forbid?

It seems to me very clear that the decision of the Supreme Court of the United States in Mackenzie v. Hare, supra, 239 U. S. 299, 36 Sup. Ct. 106, 60 L. Ed. 297, settles the questions involved here against the contention of the petitioner. There this statute (Act March 2, 1907, c. 2534, 34 Stat. 1228) was under consideration, and its construction and application before the court. There the plaintiff, who sought by mandamus to enforce her right to vote in California, a right given to all female citizens of the proper age, was born and resided, and always had resided, in the state of California. In August, 1909, while a resident and a citizen of such state, she married in that state one Gordon Mackenzie, who then resided, and who for some considerable time had resided, in California, and who intended to make that state his permanent residence. Mackenzie was a native and subject of the kingdom of Great Britain, who had not been naturalized, and who had done no act to show an intent to become naturalized in the United States. From the date of their marriage in 1909, the plaintiff and her husband, Mackenzie, had lived together continuously as husband and wife in California. In January, 1913, the plaintiff applied to be registered as a voter. She had all the qualifications of a voter, unless by her said marriage she had taken the nationality of her husband and ceased to be a citizen of the United States. She was denied registration on the ground that by such marriage to Mackenzie, a subject of Great

Britain, she had taken the nationality of her said husband and ceased to be a citizen of the United States. This action was approved and held valid by the state courts (Mackenzie v. Hare, 165 Cal. 776, 134 Pac. 713, Ann. Cas. 1915B, 261, L. R. A. 1916D, 127), and the case went to the Supreme Court of the United States, where the decision was affirmed.

The act of March 2, 1907, after providing in section 1 for passports to aliens who have filed a declaration of intention to become citizens of the United States, provides in sections 2, 3 and 4 as follows:

"Sec. 2. That any American citizen shall be deemed to have expatriated himself when he has been naturalized in any foreign state in conformity with its laws, or when he has taken an oath of allegiance to any foreign state.

"When any naturalized citizen shall have resided for two years in the foreign state from which he came, or for five years in any other foreign state it shall be presumed that he has ceased to be an American citizen, and the place of his general abode shall be deemed his place of residence during said years: Provided, however, that such presumption may be overcome on the presentation of satisfactory evidence to a diplomatic or consular officer of the United States, under such rules and regulations as the Department of State may prescribe: And provided also, that no American citizen shall be allowed to expatriate himself when this country is at war.

"Sec. 3. That any American woman who marries a foreigner shall take the nationality of her husband. At the termination of the marital relation she may resume her American citizenship, if abroad, by registering as an American citizen within one year with a consul of the United States, or by returning to reside in the United States, or, if residing in the United States at the termination of the marital relation, by continuing to reside therein.

"Sec. 4. That any foreign woman who acquires American citizenship by marriage to an American shall be assumed to retain the same after the termination of the marital relation if she continue to reside in the United States, unless she makes formal renunciation thereof before a court having jurisdiction to naturalize aliens, or if she resides abroad she may retain her citizenship by registering as such before a United States consul within one year after the termination of such marital relation."

Section 3, above quoted, was involved and under consideration in the Mackenzie Case, supra. That section says:

"That any American woman who marries a foreigner shall take the nationality of her husband."

It then provides on what conditions she may resume her American citizenship on the termination of her marriage. The Supreme Court held that, although a citizen of the United States when she married Mackenzie, and although neither she nor her husband had departed from the United States or shown an intent to do so, the mere fact of marriage to such alien was an election and choice to abandon her citizenship in the United States, and so operated; Congress having declared that it should have that effect. The court said:

"It may be conceded that a change of citizenship cannot be arbitrarily imposed; that is, imposed without the concurrence of the citizen. The law in controversy does not have that feature. It deals with a condition voluntarily entered into, with notice of the consequences. We concur with counsel that citizenship is of tangible worth, and we sympathize with plaintiff in her desire to retain it, and in her earnest assertion of it. But there is involved more than personal considerations. As we have seen, the legislation was urged by conditions of national moment. And this is an answer to the apprehension of counsel that our construction of the legislation will make every act, though lawful, as marriage, of course, is, a renunciation of citizenship. The

marriage of an American woman with a foreigner has consequences of like kind, may involve national complications of like kind, as her physical expatriation may involve. Therefore, as long as the relation lasts it is made tantamount to expatriation. This is no arbitrary exercise of government. It is one which, regarding the international aspects, judicial opinion has taken for granted would not only be valid but demanded. It is the conception of the legislation under review that such an act may bring the government into embarrassments, and, it may be, into controversies. It is as voluntary and distinctive as expatriation, and its consequences must be considered as elected."

Section 2 of this same act of Congress has declared:

"That any American citizen *shall be deemed to have expatriated himself when* he has been naturalized in any foreign state, * * * *or when he has taken an oath of allegiance to any foreign state*."

This language is definite, certain, and unequivocal. Concede that a sovereign cannot discharge a subject from his allegiance and arbitrarily deprive him of his citizenship *against his consent,* except as a punishment for crime, and that Congress cannot abridge or enlarge the rights of citizens, or restrict the effect of birth in the United States, subject to its jurisdiction; still the right of a citizen to expatriate himself exists, it is a natural and an inherent right, recognized and declared by Congress (and, since 1870, recognized by England), and the sovereign power, through Congress, may declare that the doing of certain acts, inconsistent with citizenship in the United States, shall constitute expatriation—loss of or renunciation of citizenship. Mackenzie v. Hare, supra. Congress having declared that naturalization in a foreign country, *or the taking of the oath of allegiance to a foreign government,* is expatriation, that the one doing the act "shall be deemed to have expatriated himself," it follows that such act, if voluntarily done, constitutes loss and abandonment and voluntary renunciation of citizenship in the United States. If not so, the statute is meaningless and worthless, and Congress is powerless to declare what acts constitute expatriation. Every citizen is presumed to know the law and to understand the effect of his voluntary acts. When he voluntarily does the acts which the law says operate as expatriation, we have the necessary assent. Mackenzie v. Hare, supra.

The provisions of the act of 1907, now under consideration, have justification in necessity and public policy. Mere enlistment and service in the army of a foreign government is not declared to work expatriation, but the taking of "an oath of allegiance to any foreign state" is. It is evident that it would lead to controversies and national entanglements for the United States to attempt to protect as citizens those who enlist in the English army, take an oath of allegiance, and then desert. If it be the natural and inherent right of a citizen to expatriate himself or herself, it would seem that the government should have the right to declare that the doing of acts by the citizen which are inconsistent with the discharge of his duties as such citizen to his government, accompanied by a departure from its jurisdiction, constitute expatriation—abandonment and renunciation of citizenship. There is no express grant of such power to Congress found in our Constitution. But there are powers implied necessary to the existence of a government or a nation—necessary to the exercise of sovereignty. This is one. Mackenzie v. Hare, supra.

"Alienage may arise in three ways—by birth, by election, and by operation of law." 2 Corpus Juris, 1044. "Alienage by election may take place under various conditions, such as when a country is divided into two independent sovereign countries, or when a dependent country proclaims and establishes its independence, or the like. *To this class of aliens belong also those persons who have availed themselves of the right to become aliens by expatriation*, or by being naturalized as citizens of another country." 2 Corpus Juris, 1044, 1045; Lynch v. Clarke, 1 Sandf. Ch. 583 (N. Y.) 668.

In Morse on Citizenship (1881) p. 160, § 129, it is said:

"Every individual must be a member of some political society; but he may not have more than a single citizenship or national character. It would seem to be the doctrine of modern public law that, though a person may *apparently* have a double citizenship or nationality, yet whenever circumstances arise which make two citizenships inconsistent, he must elect and determine which one he will prefer. The existing rule may be stated as follows: 'A person who has ceased to be a member of a nation, without having acquired another national character, is nevertheless deemed to be a member of the nation to which he last belonged, except so far as his rights and duties within its territory, or in relation to such nation, are concerned.' "

Field's Int. Code (2d Ed.) p. 130, note, is cited.

If this be correct, and Griffin, under our statute, ceased to be a member of the United States, but, not having been naturalized in England or Canada, so as to acquire another national character, was within the exception, so he had no rights and owed no duties as a citizen in the United States, it is difficult to understand what his status was and now is. He has definitely expatriated himself under our statute, but he has not been naturalized in England, although by his oath of allegiance he has made himself subject to that empire. He is not, however, a naturalized subject or citizen of that nation. Did he have two apparent citizenships at the time of his desertion and surreptitious return, the one inconsistent with the other, and could he and did he by such desertion and surreptitious return to the United States elect and determine which he preferred? Could he by such desertion and return nullify the effect of his oath of allegiance to the king of Great Britain and Ireland declared by statute and restore himself to full citizenship in the United States, with all the rights and privileges such status gives? I cannot assent to such contention. It may be said, however, that England must take and claim Griffin as a citizen of the empire, if she claims and takes him, or takes him, and, as he has not been naturalized in England, he had the legal right to elect citizenship by desertion and return to the United States.

In Mackenzie v. Hare, 239 U. S. 299, 36 Sup. Ct. 106, 60 L. Ed. 297, to which attention has been called, Mrs. Mackenzie assumed the marriage relation, which she could not throw off at will. The law of Congress declares that by her marriage to an alien she took on the citizenship of her husband, who was a citizen of Great Britain, and lost her citizenship in the United States. Here there was no naturalization of Mrs. Mackenzie in England, or under the laws of that country; no consent on the part of that empire; no residence or domicile in that country; no oath of allegiance. Still by her marriage with Mackenzie she lost her citizenship in the United States and her rights as such, and we are not informed as to what her

rights are under the laws of England. By the terms of the act of Congress she is restored on the termination of the marital relation by the death of her husband or by divorce, and not otherwise. But in the meantime she is *not* a citizen of the United States, and not a naturalized citizen of England. So far as the laws of the United States are concerned, she is declared to be a citizen of the kingdom of Great Britain and Ireland, but how is it under the laws of that country?

With Griffin the case is somewhat different, but still he is declared to have lost his citizenship in the United States. Congress could not make Mrs. Mackenzie a citizen of Great Britain, as only that government could do that. She gained no citizenship in any other country pursuant to its laws, and still she is not a citizen of the United States. So concede that Griffin did not gain citizenship in England, still by the act of Congress he lost his citizenship in the United States by expatriating himself, and by his oath of allegiance to the king of Great Britain he took on citizenship in that kingdom so far as the United States is concerned. In effect the act of Congress declares that Griffin took on citizenship in Great Britain and lost citizenship in the United States, and the United States must treat him as a citizen of England. This is certainly so if expatriation includes acquiring citizenship in another country.

It is contended by the petitioner's counsel that the oath of allegiance to the king of Great Britain, above quoted, taken by Griffin, is not such an oath of allegiance to a "foreign state" as is contemplated by the statute of 1907. The contention is, first, that Griffin did not swear allegiance to the kingdom of Great Britain and Ireland, or the British Empire, but only to the king; and, second, that in such oath he did not abjure allegiance to the United States of America. As already stated, the king of England is the foreign state, and the statute quoted does not require that the oath of allegiance to "any foreign state" shall abjure allegiance to the United States. In England nominally all power is centered in the king. To compass the king's death is high treason. It is the army of the king, and the king's navy, and the king's coin. The oath of allegiance to the kingdom of Great Britain and Ireland, or to the British Empire, runs to the king, in whom, nominally, all the executive power of government is centralized. An oath of allegiance to the king is an oath of allegiance to the kingdom and empire. The king declares war and makes peace. He is the head of the church. Allegiance is due to the king in his political and not his personal capacity. Isaacson v. Durant, L. R. 17, Q. B. D. 54, 65, quoted in U. S. v. Wong Kim Ark, 169 U. S. 663, 18 Sup. Ct. 456, 42 L. Ed. 890; Kilham v. Ward, 2 Mass. 236, 265; St. 4 George II, c. 21, and St. 13 George III, c. 21. Even if expatriation at common law, to be complete, required naturalization in a foreign country, Congress has declared that the act of taking an oath of allegiance to a foreign state constitutes "expatriation," whether such act amounts to naturalization or not. And this, as stated, is a necessary enactment to avoid national embarrassments and national complications.

The final question that presents itself is: Did the act of desertion from the service of the king of England, to whom Griffin had sworn allegiance, and his clandestine return to the United States, reinstate and rehabilitate him as a citizen of the United States, and give him the right to protection here as such? As already stated, I am of the opinion that Griffin became an alien by election, whether he became a citizen of the kingdom of Great Britain and Ireland or not. If the act of expatriation was complete, he lost his status as a citizen of the United States, and became an alien. I am not aware of any way for an alien (except in the cases prescribed by statute) to become a citizen of the United States other than by naturalization. The statute of 1907 makes no provision for the restoration to citizenship of one who has expatriated himself by taking the oath of allegiance to a foreign power. Reading the statute as a whole, and considering the provisions for restoration to citizenship of a woman who marries an alien, is it not fair and just to conclude that one who departs the United States and takes the oath of allegiance to a foreign power must regain his citizenship by naturalization, if at all? It seems to me this must have been in the mind and within the intent of Congress. Otherwise some other mode of restoration to citizenship in the United States would have been prescribed, as was done in the case of a woman who marries an alien and thereby takes on the citizenship and nationality of the husband.

Some of the definitions of "expatriation" state that to constitute "expatriation" there must be an actual change of *citizenship*, which would mean, in the case of removal to Canada or the British Empire, that to constitute expatriation there must be, not only a change of domicile, but naturalization according to the laws of that country. But England for a long time has had statutes declaring that foreigners enlisting into her sea or land armaments, and serving for a definite length of time, shall be ipso facto thereby naturalized. St. 13 Geo. II, c. 3; St. 2 Geo. III, c. 25; 1 Burge on Colonial and Foreign Law, 713; United States v. Wyngall, 5 Hill (N. Y.) 25.

In Ludlam v. Ludlam, 31 Barb. (N. Y.) 486, 489, it was said that to expatriate is to leave one's country and renounce allegiance to it with *the purpose* of making a home and becoming a citizen in another country; that it includes more than a change of domicile. This is of course true, and has never been seriously questioned. In that case a person left the United States in search of employment and a fortune. He not only found employment in South America, and there established himself in business, but there married and had children. However, he constantly looked forward to a return to his native country, the United States. Here, of course, there was no expatriation. There was no intent to abandon or renounce citizenship in the United States, or to become a citizen of any foreign country; he did no act inconsistent with citizenship in the United States; he took no oath of allegiance to any foreign power; and there was no statute declaring that such residence abroad constituted expatriation.

But in the instant case Griffin removed with his family to Canada, and there enlisted in the army of the king of England and took an oath of allegiance to that foreign power, which oath he, if a citizen of the United States, could not keep in case of trouble with the United States, without committing treason against the United States; and whether such acts made him a citizen of the kingdom of Great Britain and Ireland, with all the rights of a citizen of that country, or not, they were done with the consent and approval of that country, and Griffin became entitled to its protection.

"*Emigration, enlistment, and taking the soldier's oath, is effectually a change of allegiance.* Though it does not confer *all* the rights of citizenship, it is a naturalization quoad hoc; and if the expatriation be bona fide, there is nothing contrary either to law or morals in the soldier fighting against his original country, should a war break out between that and the one into whose service he has chosen to enter." United States v. Wyngall, 5 Hill (N. Y.) 16, 23.

Griffin was bound under his oath to serve England faithfully even as against the United States, and the United States in the exercise of its sovereign powers had the right to declare by statute, as it has done, that the acts done by him constitute expatriation; that is, renunciation of citizenship in the United States. Mackenzie v. Hare, supra.

This statute of the United States is a plain recognition of the doctrine of United States v. Wyngall, supra. The statute declares that, when Griffin did the acts which he did do, he effectually expatriated himself, and under the statutes of England referred to and the decisions he had taken steps in naturalization pursuant to the English laws. He emigrated, enlisted, and took the oath of allegiance required. It follows that Griffin, the petitioner, not only expatriated himself under the statute of the United States, but by his oath changed his allegiance to that of the kingdom of Great Britain and Ireland, and necessarily renounced his allegiance to the United States, and at least took the preliminary steps to become a naturalized citizen of England. Desertion and clandestine return to the United States could not restore his citizenship, or do away with the effect declared by law of his voluntary acts. Domicile, unless a law of the country forbids, may be gained at pleasure, but citizenship in an independent and sovereign nation, unless by birth, cannot be. Citizenship by birth is, of course, not a voluntary act, but determined by circumstances of birth. I cannot see that a citizen of the United States may voluntarily remove with his family to Canada, enlist in her army, take the oath of allegiance to the king of Great Britain, and still retain his citizenship in the United States. Neither can I see that, having renounced and lost his citizenship in the United States, and sworn allegiance to a foreign power, he may at will return to the United States in the manner and under the circumstances stated, and regain or restore himself to his rights and status as a citizen here.

[5] It is suggested that the oath of allegiance taken by Griffin was a "qualified" oath. But I find in it no qualification as to duty to the English government or as to time. It is true that in the declaration made on attestation he stated:

"I am willing to fulfill the engagements by me now made, and I hereby engage and agree to serve in the Canadian Overseas Expeditionary Force, and to be attached to any arm of the service therein, for the term of one year, or during the war now existing between Great Britain and Germany, should that war last longer than one year, and for six months," etc.

But this is no part of his oath of allegiance to the king, which oath is not for the time he serves as a soldier, or to expire with his period of enlistment. Even if so, the law of Congress quoted recognizes no distinction between an oath of allegiance to a foreign power indeterminate as to time and one for a specified and limited time. We cannot read into this act of Congress limitations and qualifications not found there or suggested by its terms. The law was evidently enacted to settle the question: Does taking an oath of allegiance to a foreign power constitute expatriation? It was not a new question. See Case of J. F. Bowler, which arose in 1895, and communication of. Secretary of State Gresham in reference thereto, Foreign Relations, 1895, page 853, and Van Dyne, Citizenship of the United States, 280. Secretary Gresham said:

"The oath is inconsistent with his allegiance to the United States. By taking it he obligated himself to support the government of his adoption, even to the extent of fighting its battles in the event, of war between it and the government of his origin. He could not bear true allegiance to both governments at the same time."

[2] It may be argued that Griffin, as a citizen of England, or as a man of no country, has the right to come into the United States, and that we are not concerned with returning deserters from the British army to that country. Concede this; still the United States has complete jurisdiction and control over the immigration of aliens into the United States. Aliens of any class or nationality, who enter the United States in defiance or violation of its immigration laws, may be deported. Aliens have no right to enter the United States from a foreign country clandestinely. If they so come, they are subject to deportation.

"It is an accepted maxim of international law that every sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe. Fong Yue Ting v. United States, 149 U. S. 698, 705, 13 Sup. Ct. 1016, 37 L. Ed. 905; Wong Wing v. United States, 163 U. S. 228, 231, 16 Sup. Ct. 977, 41 L. Ed. 140; Nishimura Ekiu v. United States, 142 U. S. 651, 654, 12 Sup. Ct. 336, 35 L. Ed. 1146; Chinese Exclusion Case, 130 U. S. 581, 606, 9 Sup. Ct. 623, 32 L. Ed. 1068; U. S. ex rel. Turner v. Williams, 194 U. S. 279, 24 Sup. Ct. 719, 48 L. Ed. 979; Passenger Cases, 7 How. 525, 12 L. Ed. 702, Woodbury, J., dissenting."

Section 36 of the Immigration Act (Act Feb. 20, 1907, c. 1134, 34 Stat. 898 [Comp. St. 1913, § 4285], as amended by Act March 26, 1910 [chapter 128, 36 Stat. 263] and Act March 4, 1913 [chapter 141, 37 Stat. 736]) provides as follows:

"That all aliens who shall enter the United States except at the seaports thereof, or at such place .or places as the Secretary of Labor may from time to time designate, shall be adjudged to have entered the country unlawfully and shall be deported as provided by, sections twenty and twenty-one of this act: Provided, that nothing contained in this section shall affect the power conferred by section thirty-two of this act upon the Commissioner General of

Immigration to prescribe rules for the entry and inspection of aliens along the borders of Canada and Mexico."

Ports of entry have been established, and alien immigrants must come through such ports of entry, whether entering the United States by land or sea. If they come otherwise, they are subject to deportation as aliens who have entered the country unlawfully. Being aliens, and having come into the United States clandestinely, and not through a port of entry, after an examination such as the laws of the United States and the rules and regulations of the United States Department of Labor prescribe, they are here illegally and in violation of law, and are subject to deportation for that reason. The courts do not stop to inquire whether they belong to the otherwise excluded classes of aliens, or whether or not they might have been admitted, if proper application had been made to the United States authorities at a port of entry. Having come into the United States clandestinely, and not through a port of entry and in compliance with the laws of the United States, they are within the express terms of section 36 of the Immigration Act, supra, and "shall be adjudged to have entered the country unlawfully and shall be deported," etc. United States v. Wong You, 223 U. S. 67, 69, 32 Sup. Ct. 195, 56 L. Ed. 354, affirming Wong You v. U. S. (D. C.) 176 Fed. 933, and reversing U. S. v. Wong You, 181 Fed. 313, 104 C. C. A. 535. In that case certain Chinese aliens entered the United States clandestinely, having come across the Canadian border, as did Griffin in this case. They were arrested, found to be aliens, and ordered deported. On habeas corpus this order of deportation was affirmed by this court under the provisions of section 36 of the Immigration Act of February 20, 1907, on the ground they were in the United States in violation of law, having illegally entered clandestinely. 176 Fed. 933. The Circuit Court of Appeals (181 Fed. 313, —— C. C. A. ——), reversed, holding that being Chinese persons they could not be deported under the Immigration Act, but must be dealt with under the Chinese Exclusion Laws. This action of the Circuit Court of Appeals was reversed by the Supreme Court (223 U. S. 67, 69, 32 Sup. Ct. 195, 56 L. Ed. 354, supra), and the order of this court was affirmed. The Supreme Court said:

"The parties are Chinamen, who entered the United States surreptitiously, in a manner prohibited by the Immigration Act of February 20, 1907, c. 1134, § 36, 34 Stat. 898, 908, and the rules made in pursuance of the same, if applicable to Chinese. They were arrested in transitu and ordered by the Secretary of Commerce and Labor to be deported."

They were held properly deported, not because they were Chinese persons, but because they were *aliens,* and came in surreptitiously, and were in the United States thereafter in violation of the immigration law. The petitioner, Griffin, in the instant case came in surreptitiously and in violation of the statute quoted, for the reason it appears he was and is an alien and did not come through a port of entry and submit to examination. If an alien, it must be adjudged that he entered the United States unlawfully and is in the United States in violation of law. The order for his deportation is valid on the showing made.

On the facts shown I conclude that Griffin, the petitioner, is an alien,

and subject to deportation. It has not been shown that he enlisted in the English army—Overseas Canadian Expeditionary Force—and took the oath of allegiance quoted when so under the influence of liquor that he did not understand and comprehend the nature of his acts.

The writ must be dismissed.