Arturo FLETES–MORA, Plaintiff,

v.

William P. ROGERS, Attorney General of the United States, and Richard C. Hoy, District Director of Immigration and Naturalization Service at Los Angeles, California, Defendants.

No. 138–57.

United States District Court
S. D. California,
Central Division.

March 27, 1958.

David C. Marcus, Los Angeles, Cal., for plaintiff.

Laughlin E. Waters, U. S. Atty., Richard A. Lavine, Burton C. Jacobson, Asst. U. S. Attys., Los Angeles, Cal., for defendants.

MATHES, District Judge.

Plaintiff again invokes the jurisdiction of this Court under 8 U.S.C.A. § 1503 seeking "a judgment declaring him to be a national of the United States * * *." See Fletes-Mora v. Brownell, 9 Cir., 1955, 231 F.2d 579.

In his complaint plaintiff also seeks review, under § 10 of the Administrative Procedure Act [5 U.S.C.A. § 1009], of the administrative proceedings in the Immigration and Naturalization Service of the Department of Justice, and a judgment annulling the final administrative order, as affirmed by the Board of Immigration Appeals, directing that he be granted voluntary departure in lieu of deportation to the Republic of Mexico. See Shaughnessy v. Pedreiro, 1955, 349 U.S. 48, 75 S.Ct. 591, 99 L.Ed. 868; cf. Fletes-Mora v. Brownell, supra, 231 F.2d at page 581.

The facts, as found by the special inquiry officer and as appear from uncontradicted evidence in the administrative record, are briefly these. Plaintiff is "a native of the United States, having been born in Los Angeles, California, on September 23, 1925." His parents were Mexican citizens.

When plaintiff was only a few months of age, his mother took him to Mexico to live. He resided in Mexico continuously thereafter until about July, 1951, when he "entered [this country] as a United States citizen." Plaintiff always "believed himself to have been born in Acaponeta, Nayarit, Mexico, until he was informed by his father in the early part of 1946 concerning his birth in the United States."

In 1944, when he was eighteen, plaintiff "moved to Tijuana, Mexico, where he obtained employment in the Post Office, and worked in that position until he came to the United States in July, 1951."

In order to obtain employment in the Mexican Post Office, plaintiff was required to take the following oath (translated from the Spanish): "I solemnly declare, in accordance with that set forth by Article 128 of the Political Constitution of the Republic, to keep this and the laws that emanate from it and not to be disqualified."

As the Board of Immigration Appeals pointed out: "The record does not establish that the [Post Office] employment * * * was open only to na-

tionals of Mexico. It therefore cannot be held that he expatriated himself by reason of such employment." [See § 401(d) Nationality Act of 1940, 54 Stat. 1169, 8 U.S.C. § 801(d) (1946).]

However, the special inquiry officer found that plaintiff "took an oath of allegiance to the government of Mexico on January 20, 1944 when he accepted employment with the Mexican Post Office Department in Tijuana, Mexico," and concluded that "under Section 401(b) of the Nationality Act of 1940, [plaintiff] lost his United States citizenship acquired at birth, by reason of taking an oath, or making an affirmation, or other formal declaration of allegiance to a foreign state."

Plaintiff attacks the administrative finding and conclusion just quoted, and the order under review predicated thereon, upon grounds which may be summarized as follows:

First: That the oath taken by him upon entering the employment of the Post Office Department of the Republic of Mexico did not constitute "taking an oath or making an affirmation or other formal declaration of allegiance to a foreign state" within the meaning of § 401(b) of the Nationality Act of 1940 [54 Stat. 1169, 8 U.S.C. § 801(b) (1946), now 8 U.S.C.A. § 1481(a) (2)].

Second: That the act of plaintiff in taking the oath was admittedly done "in ignorance and without knowledge of his birth in the United States and of his American citizenship," and so necessarily without intent to expatriate himself; and

Third: That at the time he took the oath in question, plaintiff was only eighteen years of age and a minor.

Meeting the least difficult contention first, it is settled that since plaintiff was over eighteen years of age at the time, his minority is no legal excuse if the oath he voluntarily took was such as to work a transfer of his allegiance to the Republic of Mexico. Nationality Act of 1940 § 403(b), 54 Stat. 1170, 8 U.S.C. § 803(b) (1946), now 8 U.S.C.A. § 1483(b); Valdez v. McGranery, D.C.S.D. Cal.1953, 114 F.Supp. 173, affirmed Valdez v. Brownell, 9 Cir., 1954, 216 F.2d 616.

Turning next to plaintiff's contention that the oath in question did not amount to "an oath * * * or other formal declaration of allegiance to a foreign state," it should be recalled at the outset that: "In this action the burden was on the plaintiff to prove that he is a United States citizen. * * * By proof of birth in the United States, he made out a *prima facie* case of citizenship which was subject to rebuttal by proof of expatriation. But on the issue of expatriation the burden of proof was on the defendant." Augello v. Dulles, 2 Cir., 1955, 220 F.2d 344, 345.

It is held moreover that the Government must meet this burden with proof that is "clear, unequivocal and convincing". Gonzales v. Landon, 1955, 350 U.S. 920, 76 S.Ct. 210, 100 L.Ed. 806; Schneiderman v. United States, 1943, 320 U.S. 118, 125, 63 S.Ct. 1333, 87 L. Ed. 1796.

The reported decisions do not clearly define the elements of an "oath * * * of allegiance" within the meaning of § 401(b) of the Nationality Act of 1940.

In Savorgnan v. United States, 1950, 338 U.S. 491, 494 note 3, 496 note 5, 70 S.Ct. 292, 295, 94 L.Ed. 287, the Court held, without comment, that signing the following constituted the taking of an "oath of allegiance" sufficient to effect expatriation: "I, Rosetta Andrus Sorge, born an American citizen, declare I renounce and in truth do renounce my American citizenship, and swear to be faithful to H. M. the King of Italy and Albania, Emperor of Ethiopia to his royal successors, and to loyally observe the statutes and other laws of the Kingdom of Italy."

In Ex parte Griffin, D.C.N.D.N.Y.1916, 237 F. 445, 447, and McCampbell v. McCampbell, D.C.W.D.Ky.1936, 13 F. Supp. 847, 848, the following oath to the English Crown was held to work expatriation: "I * * * do make oath, that

I will be faithful and bear true allegiance to His Majesty King * * * his heirs and successors, and that I will as in duty bound honestly and faithfully defend His Majesty, his heirs and successors, in [his] person, crown, and dignity, against all enemies, and will observe and obey all orders of His Majesty, his heirs and successors, and all of the Generals and officers set over me. So help me God."

In Reaume v. United States, D.C.E.D. Mich.1954, 124 F.Supp. 851, 852, an oath held to cause expatriation was worded: "I * * * do sincerely promise and swear (or solemnly declare) that I will be faithful and bear true allegiance to His Majesty."

At this juncture it is interesting to recall that in the case at bar the oath admittedly taken by plaintiff was as follows: "I solemnly declare, in accordance with that set forth by Article 128 of the Political Constitution of the Republic, to keep this and the laws that emanate from it and not to be disqualified."

An authoritative view of what is necessary in order for an oath to result in expatriation is set forth in a letter from Secretary of State Hughes: "It is the spirit and meaning of the oath, and not merely the letter, which is to determine whether it results in expatriation. It is not a mere matter of words. The test seems to be the question whether the oath taken places the person taking it in complete subjection to the state to which it is taken, at least for the period of the contract, so that it is impossible for him to perform the obligations of citizenship to this country." [3 Hackworth, Digest of International Law 219–220 (1942).]

■ Under the test just stated, the oath taken by plaintiff is not comparable with the above-quoted oaths which the Supreme Court and three District Courts have held are sufficient to bring about expatriation.

It is significant that the oath taken by plaintiff did not embrace a renunciation of allegiance to the United States or any other country of which he might be a citizen, Lehmann v. Acheson, 3 Cir., 1953, 206 F.2d 592, 597 (dictum), as did, for example, the oath in the Savorgnan case, supra, 338 U.S. at page 494 note 3, 70 S.Ct. at page 294.

Furthermore, although an expatriating oath need not use the word "allegiance" or any other particular words or formula [3 Hackworth Digest of International Law 220–222], it is to be noted nonetheless that plaintiff's oath contained no declaration of allegiance or subjection to a foreign state or sovereign. Cf. Ex parte Griffin, supra, 237 F. at page 451, 457; In re Gogal, D.C.W.D.Pa.1947, 75 F.Supp. 268, 270 note 3, 271 (dictum).

■ Where loss of American citizenship is involved, the courts will always construe both the law and the facts "as far as is reasonably possible in favor of the citizen". Schneiderman v. United States, supra, 320 U.S. at page 122, 63 S.Ct. at page 1335; Stipa v. Dulles, 3 Cir., 1956, 233 F.2d 551, 556; Chin Chuck Ming v. Dulles, 9 Cir., 1955, 225 F.2d 849, 853. A reasonable construction here is that the oath taken by plaintiff was merely a promise to do what every resident of Mexico, citizen and non-citizen alike, must in all events do—obey the laws of Mexico while in Mexico. Cf. Ex parte Griffin, supra, 237 F. at pages 450–451.

■ Our law has long recognized an alien's obligation of "temporary allegiance" to a country while he is within its territory. The term "temporary allegiance" refers to the alien's duty to obey all laws of a country not immediately relating to citizenship so long as he remains in that country. Carlisle v. United States, 1872, 16 Wall. 147, 154–155, 83 U.S. 147, 154–155, 21 L.Ed. 426; Eisler v. United States, 83 U.S.App.D.C. 315, 170 F.2d 273, 279 certiorari granted 1948, 335 U.S. 857, 69 S.Ct. 130, 93 L.Ed. 404, ordered off docket, 1949, 338 U.S. 189, 69 S.Ct. 1453, 93 L.Ed. 1897; Leonhard v. Eley, 10 Cir., 1945, 151 F.2d 409; see: United States v. Tomoya Kawakita, D.C.S.D.Cal.1950, 96 F.Supp. 824, 826–827, affirmed on other grounds, 9 Cir., 1951, 190 F.2d 506; 1952, 343 U.S. 717, 72 S.Ct. 950, 96 L.Ed. 1249; 3 Hack-

worth, Digest of International Law 228; 5 id. 471; 2 id. 84.

Mr. Justice Field, writing for an unanimous Court in Carlisle v. United States, supra, explained the obligation of "temporary allegiance" in these words: "The claimants were residents in the United States * * *. [T]hey were, therefore, bound to obey all the laws of the country, not immediately relating to citizenship, during their sojourn in it * *. 'All strangers are under the protection of the sovereign while they are within his territories, and owe a temporary allegiance in return for that protection.'

"By allegiance is meant the obligation of fidelity and obedience which the individual owes to the government under which he lives, or to his sovereign in return for the protection he receives. It may be an absolute and permanent obligation, or it may be a qualified and temporary one. The citizen or subject owes an absolute and permanent allegiance to his government or sovereign, or at least until, by some open and distinct act, he renounces it and becomes a citizen or subject of another government or another sovereign. The alien, whilst domiciled in the country, owes a local and temporary allegiance, which continues during the period of his residence.

" ' * * * Independently of a residence with intention to continue such residence; independently of any domiciliation; *independently of the taking of any oath of allegiance or of renouncing any former allegiance,* * * * an alien or a stranger born, for so long a time as he continues within the dominions of a foreign government, owes obedience to the laws of that government * * *.' " 16 Wall. at pages 154–155, 83 U.S. at pages 154–155, emphasis added.

Plaintiff is not to be held to have expatriated himself by promising to do something—obey the Constitution and laws of the country wherein he resided— that our law clearly recognizes he was obligated to do, oath or no oath. Moreover, a holding that the oath in question is not an "oath * * * of allegiance" sufficient in law to cause expatriation is buttressed by the similarity of this oath to other oaths promising to uphold the laws of foreign countries, which the Department of State has administratively held not to be expatriating oaths. [See 3 Hackworth, Digest of International Law 222–223.]

For example, the following oath was required in 1934 of persons entering the practice of law in Germany, and was held by our Department of State not to result in expatriation: "I swear allegiance to the constitution of the Reich. I swear that I shall also observe the Prussian constitution conscientiously and that I shall administer the office conferred upon me to the best of my knowledge and ability and without party prejudice, so help me God." [Id. at page 223.]

■ There are cases intimating that the question of whether an oath is an "oath * * * of allegiance", within the meaning of that phrase as used in the Nationality Act of 1940 and its predecessors, is a question of fact, at least insofar as the Government's burden of proof is concerned. Alata v. Dulles, 1955, 95 U.S.App.D.C. 182, 221 F.2d 52, 54 (dictum); Acheson v. Maenza, 1953, 92 U.S.App.D.C. 85, 202 F.2d 453, 456–457 (semble). More precisely, perhaps, it is a mixed question of fact and law.

■ To the extent that it is a question of fact whether an oath is of the character required for expatriation, it must be held that the facts here do not meet defendants' burden of showing by the " 'clear, unequivocal, and convincing' evidence" required in actions such as this [cf. 8 U.S.C.A. § 1252(b) (4)], that the oath taken by plaintiff was such as to work his expatriation. Gonzales v. Landon, supra, 350 U.S. 920, 76 S.Ct. 210, 100 L.Ed. 806; Schneiderman v. United States, supra, 320 U.S. at pages 125, 135, 158, 63 S.Ct. at pages 1341, 1352, 87 L.Ed. 1796; Knauer v. United States, 1946, 328 U.S. 624, 657–658, 66 S.Ct. 1304, 90 L.Ed. 1500; Baumgartner v.

United States, 1944, 322 U.S. 665, 670, 64 S.Ct. 1240, 88 L.Ed. 1525; Bruni v. Dulles, 1956, 98 U.S.App.D.C. 358, 235 F.2d 855; Stipa v. Dulles, supra, 233 F.2d at page 556; Soccodato v. Dulles, 1955, 96 U.S.App.D.C. 337, 226 F.2d 243, 246–247; Chin Chuck Ming v. Dulles, supra, 225 F.2d at page 853; Monaco v. Dulles, 2 Cir., 1954, 210 F.2d 760.

█ That plaintiff is a "dual citizen" is a forceful consideration which argues this conclusion. Born in the United States of parents who were citizens of Mexico, plaintiff in the eyes of the law of the United States is a native American citizen who, like all others, owes his allegiance to the United States; while in the eyes of the law of Mexico he is a Mexican citizen owing his allegiance to the Republic of Mexico. A person of such dual nationality should not be held to have expatriated himself unless it clearly appears that he has voluntarily done some act by which he unequivocally renounced his allegiance to the United States. See: 8 U.S.C.A. § 1482; Tomoya Kawakita v. United States, supra, 343 U.S. at pages 722–725, 72 S.Ct. at pages 955–956, 96 L.Ed. 1249; Augello v. Dulles, supra, 220 F.2d at page 345.

Defendants at bar have not met that burden. In other words, upon the facts here, defendants have not shown by "evidence which does not leave the issue in doubt" [Schneiderman v. United States, supra, 320 U.S. at pages 135, 138, 63 S.Ct. at page 1341], that plaintiff's oath was indeed an oath of allegiance to Mexico. Acheson v. Maenza, supra, 202 F.2d at page 456; cf. Savorgnan v. United States, supra, 338 U.S. at pages 494, 496 note 5, 70 S.Ct. at pages 293, 295, 94 L.Ed. 287; Reaume v. United States, supra, 124 F.Supp. at pages 852, 854;

McCampbell v. McCampbell, supra, 13 F.Supp. at pages 848–849; Ex parte Griffin, supra, 237 F. 445; see 3 Hackworth, Digest of International Law 217–228 (1942).

In view of the conclusion that the oath plaintiff took does not constitute an expatriating "declaration of allegiance" within the meaning of § 401(b) of the Nationality Act of 1940, it is unnecessary to reach the more difficult contention that plaintiff's taking the oath, even if it were an "oath * * * of allegiance", could not have expatriated him inasmuch as he took the oath while innocently ignorant of his United States citizenship, and so necessarily without intent to expatriate himself. But see Savorgnan v. United States, supra, 338 U.S. at pages 499–502, 70 S.Ct. at pages 296–298.

█ Moreover, since the Supreme Court now has a similar problem *sub judice*, it would be all the more inappropriate to express an opinion on the question at this time. See: Trop v. Dulles, 2 Cir., 1956, 239 F.2d 527, certiorari granted 352 U.S. 1023, 77 S.Ct. 591, 1 L.Ed.2d 596, ordered reargued, 1957, 354 U.S. 935, 77 S.Ct. 1393, 1 L.Ed.2d 1535, argued Oct. 28, 29, 1957, 78 S.Ct. 590.

For the reasons stated, plaintiff is entitled to judgment: (1) annulling the final administrative order of the Attorney General directing that plaintiff be granted voluntary departure in lieu of deportation, and (2) declaring plaintiff to be a national of the United States as provided in 8 U.S.C.A. § 1503.

The attorney for plaintiff may lodge with the Clerk, within ten days, findings of fact, conclusions of law and judgment, to be settled in accordance with Local Rule 7, West's Ann.Code.