**TERUO NAITO v. ACHESON, Secretary of State.**

No. 13118–WB.

United States District Court
S. D. California, Central Division.

July 24, 1952.

---

Wirin, Rissman & Okrand, Los Angeles, Cal., for plaintiff.

Walter S. Binns, U. S. Atty., Clyde C. Downing, Asst. U. S. Atty., Robert K. Grean, Asst. U. S. Atty., Los Angeles, Cal., for defendant.

BYRNE, District Judge.

In 1949 the plaintiff, as a citizen of the United States, applied for an American passport at the office of the United States Consul at Yokohama, Japan. The application was denied and the defendant issued to plaintiff a "Certificate of Loss of Nationality". Plaintiff filed this action, under 8 U.S.C.A. § 903, for a judgment declaring him to be a national of the United States.

The Certificate of Loss of Nationality was issued on the ground that plaintiff had expatriated himself under 8 U.S.C.A. § 801(d):

"A person who is a national of the United States whether by birth or naturalization, shall lose his nationality by: * * * Accepting, or performing the duties of, any office, post, or employment under the government of a foreign state or political subdivision thereof for which only nationals of such state are eligible".

However, the litigants have also put in issue the question of whether plaintiff also expatriated himself under 8 U.S.C.A. § 801(e) (voting in a political election in a foreign state) by reason of his having voted in a Japanese general election in April 1946.

■ On the voting issue, this court finds as a fact that plaintiff's act of voting was not his free and voluntary choice, but was the result of duress and coercion which impelled him to vote because he feared the consequences if he abstained from voting. See Kuwahara v. Acheson, D.C., 96 F.Supp. 38, where the general conditions surrounding the 1946 elections in Japan are discussed at length. The evidence in the present trial clearly demonstrated that the conditions described in the Kuwahara case operated to deprive the plaintiff of his free choice in deciding whether or not to vote.

The critical question in this case is whether or not the plaintiff accepted or performed the duties of "any office, post, or employment under the government of a foreign state or political subdivision thereof for which only nationals of such state are eligible."

■ Plaintiff was born in Seattle, Washington, on January 3, 1921. His birth having occurred prior to the 1924 amendment to the Japanese law, he automatically had dual citizenship of the United States and Japan. At the age of eighteen he attended school part time and worked at the army provision depot in a clerical capacity. His duties consisted of "helping the paymaster sergeant" in connection with the roster of civilian employees. Plaintiff continued in this employment until January 1947, and there were no appreciable changes in his duties although his classification on the records of his employer was changed successively from Jisshusei to Hissei to Koin to Gyamushu to Hannikan.

It is apparently the contention of the defendant that when the plaintiff's classification was changed to "Hannikan" he became an official with duties "for which only nationals of (Japan) are eligible". This contention is made in the face of the undisputed evidence that the plaintiff's duties and responsibilities never changed; that during his entire employment he continued as a clerical assistant to the paymaster sergeant.

Defendant concedes that the only Japanese statute in effect during the period in question which limited eligibility to office by reason of nationality was Article 16 of the Japanese Nationality Law.[1] He further

1. Article 16. A naturalized person, a person, who, being the child of a naturalized person, has acquired Japanese nationality, or a person who has been adopted by, or has become the nyufu of, a Japanese, shall not possess the following rights:

(1) The right to become a Minister of State;
(2) The right to become the President or the Vice-President or a member of the Privy Council;
(3) The right to become an official of cholumin rank in the Imperial Household;

concedes that the plaintiff did not hold any of the posts enumerated in Article 16. However, he contends that the following provisions of Japanese law imply that only nationals of Japan are eligible to perform any official duties, and that when plaintiff was classified as "Hannikan" his duties became official duties. The Japanese law relied on by defendant follows:

*Paragraph 2, Article 24, Japanese Nationality Act of 1899.*

"A person who actually occupies an official post, civil or military, does not lose Japanese nationality—until after he has lost such official post."

*Imperial Ordinance No. 39, 1887.*

"All officials shall owe allegiance to the Emperor and his government and shall fulfill their duties according to the laws and ordinances."

*Paragraph 1, Article 9, Japanese Pension Law.*

"A person entitled to a pension in the form of an annuity shall lose his or her right therefor in one of the following cases:

1. When he or she has died.

2. When he or she has been sentenced to death, or to life, or over three years of penal servitude or imprisonment.

3. When he or she has lost Japanese nationality."

The inquiry is thus posed: Will the above quoted provisions of Japanese law reasonably sustain the inference contended for by the defendant?

A. *As to the Nationality Act of 1899, Article 24:*

Before inquiring into the exact significance of Article 24, the entire Nationality Act of 1899 should be briefly sketched:

(1) Articles 1–15 deal with various methods by which Japanese nationality may be *acquired* other than by birth in Japan.

(2) Article 16 sets out seven classes of official posts which only native born Japanese may occupy [see margin note (1)]. Article 17 allows the Attorney General, subject to imperial sanction, to permit naturalized citizens to hold these offices under certain conditions.

(3) Articles 18–23 enumerate various methods by which Japanese nationality may be *lost*.

(4) Articles 25, 26 and 27 relate to renunciation and restoration of Japanese nationality.

First, the Act sets out the methods of *acquiring* nationality; then it limits the rights of naturalized persons to hold certain posts. It then sets out the methods by which Japanese nationality may be *lost*.

Precisely how does Article 24 fit into this scheme? The answer is to be found, not in the language extracted from context by defendant, but from reading the article in its entirety:

"A person who actually occupies an official post, civil or military, shall not lose Japanese nationality *notwithstanding the provisions of the preceding eight articles* until after he or she has lost such official post." (Emphasis added.)

The legislature recognized the patent inconsistency caused by the fact that Article 16 requires that the officials enumerated therein must be nationals to hold their posts, but that such an official might, pursuant to one of the methods set out in Articles 18–23, lose the nationality required by Article 16.

Accordingly, Article 24 was inserted to fill the hiatus thus created, by providing that the occupant of an official post, *of the variety enumerated in Article 16,* will not lose his nationality during his official tenure, even though he has performed one of the acts set out in Articles 18–23, by which nationality may be lost. It

(4) The right to become an Envoy Extraordinary and Minister Plenipotentiary;

(5) The right to become a General Officer in the army or an Officer of Flag rank in the navy;

(6) The right to become President

of the Supreme Court, President of the Board of Audit, or President of the Court of Administrative Litigation;

(7) The right to become member of the Imperial Diet.

follows that Article 24 most emphatically does not support the inference that *every* "official" in the Japanese government must be a Japanese national in order to accept or perform the duties of such official post. Had the legislature so intended, they would have said so in the same manner that they attached nationality qualifications to the positions enumerated in Article 16. Under the maxim, *Expressio Unius Est Exclusio Alterius,* when nationality qualifications are attached to certain offices, an intention to exclude all others may be inferred.

B. *As to Imperial Ordinance No. 39, 1887:*

■■ This does nothing more than codify the elementary principle relating to the *consequences* of becoming an official in the Japanese government. It does not lay down a *condition precedent* for eligibility to official posts in the government. Even a visitor to a foreign country owes temporary allegiance to the sovereign, while within his territories, as a *consequence* of his presence in such foreign country.[2]

Here the defendant concedes the plaintiff's employment during the period when he was classified as Jisshusei, Hissei, Koin, and Gyamushu was not employment "for which only nationals of (Japan) are eligible", but certainly Imperial Ordinance No. 39 applied to him then as well as during the period when he was classified as Hannikan. If there could be any question in that regard, it is removed by section XVII of the ordinance, which provides:

"Provisions of this regulation (Ordinance No. 39) shall apply to all minor and higher officials *as well as to all other persons performing public service for pay.*" (emphasis added)

C. *As to the Japanese Pension Law, Article 9, para. 1:*

■ It is difficult to see how any inference of any kind could be drawn from this provision of the Japanese law. There is no evidence in the record that the plaintiff was subject to the Japanese Pension Law or that he was "entitled to a pension in the form

of an annuity", or in any other form. There is no indication from the section of the Act in evidence whether the pension privilege is for certain officials, all officials, or for employees as well as officials.

To draw the inference contended for by the defendant, from these laws, would indeed require reasoning remote from reality.

Even if we were to assume that all officials were required to be Japanese nationals, the evidence does not establish that the plaintiff was an official. Even the expert *called by the defendant at the trial,* testified that a person classified as "Hannikan" may be an official or merely an employee.

■ The defendant places great emphasis on an admission included in a questionnaire signed by the plaintiff in the office of the United States Consul at Tokyo, Japan, at the time of his application for a passport to return to this country. The questionnaire in mimeographic form containing twenty-one numbered questions and fifteen sub-questions was signed by the plaintiff after the answers to the questions had been typed by a clerk in the Consul's office. One of these questions read: "Was office, post or employment held by you one for which only nationals of Japan or other foreign state were eligible to hold?" The typed answer to the question was "yes". Assuming that the plaintiff, with his very limited understanding of English, understood this question, he certainly was not qualified to express a conclusion as to Japanese law. It is clear from the documentary evidence produced by both sides in the form of affidavits of experts on Japanese law that there was no statute, ordinance or regulation requiring Japanese nationality as a prerequisite to eligibility for the clerical job held by plaintiff and that the opinions of the experts were admittedly based on rather tenuous theories because of the lack of law on the subject.

■ A question of foreign law is a question of fact in the courts of this nation. Rowan v. Commissioner of Internal Revenue, 5 Cir., 120 F.2d 515; Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U.S.

2. Carlisle v. United States, 16 Wall. 147, 21 L.Ed. 426, 429; Wildman's Institutes on International Law, page 40.

397, 9 S.Ct. 469, 32 L.Ed. 788, and the burden of proving the defense of loss of citizenship because of employment for which only nationals of Japan are eligible rests upon the defendant. Schioler v. Secretary of State, 7 Cir., 175 F.2d 402, 403.

While, under 8 U.S.C.A. § 802, a rebuttable presumption of expatriation exists, this presumption was overcome by plaintiff's evidence, thereby casting the ultimate burden of this factual question on defendant. Tomoya Kawakita v. United States, 343 U.S. 717, 72 S.Ct. 950.

The evidence presented by the defendant does not, even remotely, rise to the level of the exacting standard of proof required to deprive a person of citizenship. As the Supreme Court has stated: "Proof to bring about a loss of citizenship must be clear and unequivocal". Baumgartner v. United States, 322 U.S. 665, 670, 64 S.Ct. 1240, 1243, 88 L.Ed. 1525; Schneiderman v. United States, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796.

Judgment of United States nationality will accordingly be entered for plaintiff, who is requested to prepare findings in accordance with local Rule 7.