MATTER OF BECHER

In Exclusion Proceedings

A-13466018

*Decided by Board March 23, 1965*
*Decided by Attorney General August 21, 1967*

In the absence of substantial evidence that applicant, a dual national of the United States and Canada, "voluntarily relinquished" her United States citizenship [*Afroyim* v. *Rusk*, 387 U.S. 253 (1967)], she did not lose her citizenship under the provisions of section 349(a) (4) (A) of the Immigration and Nationality Act, as a result of her employment as a public school teacher in Canada, while a national of that country.

EXCLUDABLE: Act of 1952—Section 212(a) (20) [8 U.S.C. 1182(a) (20)]—Immigrant without immigrant visa.

**BEFORE THE BOARD**

The applicant applied for admission as a United States citizen; she has no documents authorizing her admission as an immigrant. The special inquiry officer, finding that she had lost her citizenship by working in Canada, excluded her and certified his order to the Board. Applicant contends she is a citizen of the United States. No change in the special inquiry officer's order will be made, but the case will be referred to the Attorney General for review.

The applicant, born in the United States on December 11, 1919, married a native of Canada on February 13, 1941; she was admitted to Canada for permanent residence on June 2, 1944. For a substantial part of the time from 1955 to 1962, the applicant was a public school teacher in the Province of Ontario, Canada. In January 1962, entering as a United States citizen, she resumed residence in the United States; her husband was admitted for permanent residence on June 17, 1964. Returning from a visit to Canada on August 23, 1963, applicant attempted to enter as a United States citizen; the fact of her employment in Canada was learned, and these proceedings arose.

The special inquiry officer found that applicant had lost United

States citizenship by reason of the provisions of section 349(a) (4) (A) of the Act (8 U.S.C. 1481(a) (4) (A)) which in pertinent part provide as follows:

Section 349. (a) From and after the effective date of this chapter a person who is a national of the United States whether by birth or naturalization, shall lose his nationality by—

(4) (A) accepting, serving in, or performing the duties of any office, post, or employment under the government of a foreign state or a political subdivision thereof, if he has or acquires the nationality of such foreign state;
* * *

The issues presented by the record are whether (1) applicant has Canadian nationality, (2) applicant has been employed under a political subdivision of Canada, and (3) applicant's employment as a teacher comes within the statute.

The record establishes that applicant had Canadian as well as United States nationality when she accepted employment in September 1955 as a school teacher. The special inquiry officer, setting forth the pertinent laws and correctly applying them, has shown that the applicant's husband was a British subject, but not a Canadian citizen at the time of his birth, that the applicant became a British subject by marriage on February 13, 1941 (Ex. 3–R), that on January 1, 1947, the applicant's husband became a citizen of Canada (Ex. 4–R, Canadian Citizenship Act of 1946 (R.S.C. 1952, c. 33), Part I, sec. 4(1) (a)), and that by operation of law, the applicant became a citizen of Canada as of June 2, 1944, the date of her lawful admission to Canada for permanent residence (Canadian Citizenship Act, *supra*, Part II, subsections (1) (d) and (2) (d) of sec. 9); this automatic naturalization did not result in her loss of United States citizenship (see *Matter of W—*, 3 I. & N. Dec. 107).

The question now is whether the applicant was employed by a foreign state or a political subdivision of Canada. In *Matter of L—*, 9 I. & N. Dec. 313, we held employment as a public school teacher by the Public School Board of London, Ontario, Canada was such employment; however, the answer to the question must be based upon the evidence of record before us (sec. 236 of the Act, 8 U.S.C. 1226).

Mr. A. W. Bishop, Assistant Superintendent, Registrar's Branch of the Department of Education, Ontario, Canada stated in an official letter dated August 7, 1964 (Ex. 6–R):

We do not consider that a teacher in the Public Schools of Ontario is performing duties of any office, post, or employment under the Government of the Province of Ontario or the Dominion of Canada.

Mr. Bishop's statement is not determinative of the question: Judgement as to the nature of the employment must be made by the United

States authorities to whom Congress has entrusted the responsibility; the statement leaves open the question as to whether the applicant was employed by a political subdivision; and finally, it gives no convincing reason for the conclusion stated.

While Congress has not defined the words "political subdivision" for the purpose of the immigration laws, in definitions for other purposes Congress gave the term a meaning broad enough to bring within its compass any instrumentality or organization of the state (26 U.S.C. 3121(j) (4) (C); 43 U.S.C. 617k); and judicial interpretations bring within its compass "bureaus or corporations which are government owned and controlled" (*Kawakita* v. *United States*, 343 U.S. 717, 729 (1952)) and divisions of a state, made by the state for the purpose of using public funds to carry out functions which are commonly regarded as public (*Commissioner* v. *Shamberg's Estate*, 144 F.2d 998, 1004 (2d Cir. 1944); 30 Op. Atty. Gen. 252 (1914)).

These definitions are broad enough to require the finding that the applicant was working for a political subdivision of Canada. To teach in Ontario one must hold a certificate issued by the Department of Education of the Province of Ontario; applicant had such a certificate. Teaching positions are contracted directly with local school boards. Applicant's first (and major) employment was with The Public School Board of School Section No. 11 of the Township of Westminister in London, Ontario. This Board engaged her to teach in a rural public school, paid her salary, and had the power to terminate or continue her contract. Members of the board are elected; they are constituted by the Public Schools Act; they receive their money from local taxation and from grants made by the Ontario Department of Education. Public school teachers pay contributions to a retirement fund (Teachers' Superannuation Fund)—a provincial fund administered by a Commission of the Province of Ontario; the teacher's payment is six percent of her salary; the Province of Ontario contributes six percent. Contracts with teachers cannot be broken without reasons being given, and every teacher has the right to appeal through an agency set up by the Province of Ontario. The teachers and school boards carry on under the Department of Education Act, and various school acts and regulations. We believe the record satisfactorily establishes that the school board which is set up by the Province of Ontario and uses tax money for a public purpose is a political subdivision of the Province.

To determine whether or not the occupation of a public school teacher is within the statute of expatriation, we must consider the meaning of the phrase "office, post or employment" and then determine whether the mere holding of an occupation coming within the phrase

will result in expatriation or whether only the holding of an occupation, the duties of which exclude allegiance to the United States can result in expatriation.

The combination of words "office, post or employment" commonly appear as classifications of occupations held by public employees; in this area, each word has gained a recognized meaning. "Office" covers occupations in which sovereign powers are exercised and the duties are prescribed by law; "post" covers occupations involving nonpolitical functions; and "employment" covers occupations of less importance, dignity or independence where the work is performed under close supervision, the duties can often be changed at will, and the employee is often subject to summary discharge (*United States* v. *Schlierholz*, 137 F. 616, E.D. Ark (1905); *Cain* v. *United States*, 73 F. Supp. 1019, 1021–22, N.D. Ill. (1947)). Congressional use here of the phrase "office, post or employment" indicates that the broadest description of occupations was intended: this description would include public school teaching.

We may now consider whether taking or holding an occupation need be inconsistent with retention of allegiance to the United States to result in expatriation. It is our conclusion that such a requirement does not exist. An act performed with intent to give up allegiance would not result in loss of United States citizenship unless the act was one which Congress specifically made a ground of expatriation; on the other hand, the mere performance of an act specifically made a ground of expatriation, results in loss of citizenship regardless of intent (*Perez* v. *Brownell*, 356 U.S. 44 (1958)). Since actual intent to give up allegiance is not material and since the range of occupations included under section 349(a)(4)(A) runs from the highest to the lowest, it would seem to follow that the mere doing by a dual national of what Congress specifically made a ground of expatriation—here, the taking of an occupation under the government of his foreign nationality, would result in expatriation.

In a similar situation providing for loss of nationality by naturalized aliens residing abroad, the Court held that the Congressional plan provided that the mere doing of the act proscribed, regardless of intent and regardless of whether it was inconsistent with retention of allegiance to the United States was to result in expatriation (*Schneider* v. *Rusk*, 377 U.S. 163 (1964) (declaring section 352 of the Act (8 U.S.C. 1484) unconstitutional)).

Historically, the question of allegiance was not a factor in deciding cases involving loss of citizenship from employment. Without discussing the question of intent or the relation of the duties to the re-

tention of allegiance to the United States, the following occupations were expressly or by implication considered expatriating: [1]

> postal employee (Mexico) [2]
> member of agricultural guild (Italy) [3]
> paymaster's assistant (Japan) [4]
> engineer on ferry boats (Japan) [5]
> policeman (Mexico) [6]
> public school teacher (Japan) [7]
> school board member (Canada) [8]
> stenographer (Canada) [9]
> 2d mate on merchant ship (Norway) [10]
> pumpman municipal water system (Mexico) [11]

By way of dicta two cases opposed the tenor of the cases previously set forth: In *Kenji Kamada v. Dulles*, 145 F. Supp. 457 (N.D. Cal., 1956), teaching from 1941 to 1949 in a primary school operated by a Japanese municipality was by way of dicta held not to be the type of occupation condemned, since performance of the duties was not inconsistent with retention of allegiance to the United States. *Insogna v. Dulles*, 116 F. Supp. 473, D.C., D.C. (1953), involved the question of whether Insogna had been expatriated because of her employment by the Bureau of Vital Statistics in Italy. Insogna contended that the

---

[1] Most cases were decided under the predecessor section which was more restrictive in that it required the occupation to be open only to nationals of the foreign country (section 401(d), Nationality Act of 1940, 54 Stat. 1168). To "strengthen the law and make for a determination of citizenship and an elimination of dual citizenship" (S. Rep. No. 1515, 81st Cong., 2d Sess. 749–50 (1950), the predecessor section was revised to eliminate the requirement that the occupation be open only to nationals of the foreign state and to make it sufficient that the dual national had the nationality of the country which employed him. It would, therefore, appear that the same views would be taken today.

[2] *Fletes-Mora v. Rogers*, 160 F. Supp. 215 (S.D. Cal., 1958).

[3] *In re Torchia*, 113 F. Supp. 192 (N.D. Pa., 1953).

[4] *Teruo Naito v. Acheson*, 106 F. Supp. 770 (S.D. Cal., 1952).

[5] *Minoru Furuno v. Acheson*, 106 F. Supp. 775 (S.D. Cal., 1952).

[6] *Elizarraraz v. Brownell*, 217 F.2d 829 (9th Cir., 1954); *Matter of M—P—*, 2 I. & N. Dec. 363; *Stipa v. Dulles*, 233 F.2d 551 (3d Cir., 1956) (auxiliary policeman, Italy).

[7] *Dulles v. Katamoto*, 256 F.2d 545 (9th Cir., 1958); *Akiyo Oye v. Acheson*, 110 F. Supp. 635 (N.D. Cal., 1935); *Matter of Z—*, 9 I. & N. Dec. 329 (Israel); *Matter of L—*, 9 I. & N. Dec. 313 (Canada): *Matter of G—*, 4 I. & N. Dec. 521 (Italy): *Matter of S—P—*, 2 I. & N. Dec. 57 (Mexico); *Matter of S—*, 1 I. & N. Dec. 304 (Canada).

[8] *Matter of R—*, 2 I. &. N. Dec. 60.

[9] *Matter of W—*, 2 I. & N. Dec. 231.

[10] *Matter of L—*, 3 I. & N. Dec. 98.

[11] *Matter of Hernandez*, Int. Dec. No. 1289.

employment was not employment as is contemplated by the statute and that she had taken the job under duress. The court decided the case on the theory that duress was present; however, without specifying the reasons, the court did state that the case raised grave doubt as to whether Insogna had technically placed herself within the framework of the statute.

In holding that section 349(a) (4) (A) does not call for inquiry into whether the requirements of an occupation are inconsistent with the retention of United States citizenship, we realize that a question as to its constitutionality will arise; however, matters of constitutionality are not within our jurisdiction. It is our function to interpret the intent of Congress; we can find nothing in the history of the Act which indicates that it was the intent of Congress that only an occupation whose duties are inconsistent with retention of allegiance to the United States was to result in expatriation. We also realize, having been so informed by the Service representative on several occasions when similar cases were before us, that the Department of State has taken the position that teaching in a state-operated school system is not the holding of an occupation which will bring about loss of United States citizenship under section 349(a) (4) (A). We are, however, not aware of the basis for this conclusion.

The applicant contends that her employment was under duress of economic pressure since her husband's income was inadequate for the family's needs. The contention must be dismissed. First, we do not believe the defense of duress is available to the applicant. Section 349(b) of the Act (8 U.S.C. 1481(b)) provides a conclusive presumption that an act was voluntarily done, if at the time of its doing, the doer was a national of the state in which the act was done and had been physically present there for ten years or more immediately prior to the act. The section applies to the applicant: She was employed in Canada for periods from September 1955 to December 31, 1962; she lived in Canada for the greater part of the period from 1938 to 1962; any employment she took or held after she had been physically present in Canada for ten years requires the application of section 349(b) of the Act. The record is not clear as to the total physical presence in Canada from 1938, but it does show that in the more than 18 years between June 1944 and December 1962, even taking into consideration the fact that applicant spent up to six months in the United States when her children were born, she was physically present in Canada about three fourths of the time. In the period from June 1944, two children were born (about 1946 and 1947). Giving applicant credit for being physically present in Canada for four months in 1955, six months in 1946, six months in 1947, and nine months in each of the

remaining years of the period, it can be seen that by the end of 1959, applicant had over 130 months of physical presence in Canada, or well over the ten years of physical presence specified in section 349(b) of the Act. Applicant was employed for ten months in 1960; clearly then, when applicant took employment in 1960 she called the provisions of section 349(b) of the Act into operation.

Furthermore, even if the defense of duress was available to applicant, we would hold that she had lost United States citizenship. The applicant's loss of nationality was put in issue when she applied for admission on August 23, 1963; if the claim of duress could be litigated, the law would impose a presumption that applicant taught voluntarily, and place upon her the burden of showing by a preponderance of the evidence that she had not taught voluntarily (section 349(c) of the Act, 8 U.S.C. 1481(c) (Supp. IV); *Matter of P—R—*, 9 I. & N. Dec. 578). Applicant cannot satisfy this burden. She claims that she began to work in 1955, because her husband could not adequately support the family whose needs were great, for they were buying a house, had small children, and had heavy medical bills. She also claimed that ther husband's income came irregularily and to prevent a "feast or famine" situation she went to work so that a steady income could be counted upon (p. 35). However, at that time her husband, a real estate salesman, had an income of from three to six thousand dollars a year (p. 36). It is true that the income was irregularly received, however, we do not believe that this fact or the size of the income is sufficient to permit a finding that applicant has borne her burden of establishing economic duress.

The Service has established by a preponderance of evidence that applicant expatriated herself under section 349(a)(4)(A) of the Act by taking employment as a public school teacher in Canada.

Since our interpretation of section 349(a)(4)(A) is in conflict with the interpretation of the Department of State, we shall, in accordance with the provisions of 8 CFR 3.1(h)(1)(ii), refer the case to the Attorney General for review.

**ORDER:** It is ordered that no change be made in the order of the special inquiry officer.

*It is further ordered* that in accordance with the provisions of 8 CFR 3.1(h)(1)(ii) this case be referred to the Attorney General for review.

### BEFORE THE ATTORNEY GENERAL

The Board of Immigration Appeals referred to the Attorney General for review, under 8 CFR § 3.1(h)(1)(ii), its order of March 23, 1965, affirming an order of the special inquiry officer for exclusion on

the ground that the applicant is an alien who did not have an immigrant visa. The applicant, who was born in the United States, contends that she is a United States citizen.

The special inquiry officer and the Board of Immigration Appeals found that she lost her United States citizenship by her employment as a public school teacher in Canada, while a dual national of that country, under section 349(a)(4)(A) of the Act, 8 U.S.C. § 1481(a)(4)(A), which provides in pertinent part:

> From and after the effective date of this Act a person who is a national of the United States whether by birth or naturalization, shall lose his nationality by—
>
>    ＊        ＊       ＊       ＊       ＊       ＊       ＊
>
> (4)(A) accepting, serving in, or performing the duties of any office, post, or employment under the government of a foreign state or a political subdivision thereof, if he has or acquires the nationality of such foreign state ＊ ＊ ＊.

The particular question on which the Board sought review is whether public school teaching is a type of "employment under the government of a foreign state or political subdivision thereof" within the statute quoted above. The Board had answered this question in the affirmative, while the Department of State adhered to a contrary position.

After consideration of this issue in my Office, resolution of it was deferred because of the pendency in the Supreme Court of a case which presented legal issues that might have a bearing on the particular question of statutory coverage raised by the Board. In its recent decision in that case, *Afroyim* v. *Rusk*, 387 U.S. 253 (May 29, 1967), the Court held unconstitutional section 349(a)(5) of the Act, providing for expatriation of a citizen who votes in a foreign political election. The ground for the holding is that Congress lacks power under the Constitution to expatriate a citizen unless he "voluntarily relinquishes" his citizenship. This principle of *Afroyim* must obviously be taken into account in considering cases of possible expatriation under other provisions of section 349(a). Application of *Afroyim* makes it unnecessary at this time to answer the Board's question about the statutory coverage of school teaching, in view of the facts of the present case.

These facts may be stated briefly. In addition to applicant's United States citizenship by birth, she had also acquired Canadian citizenship under the law of that country by virtue of her marriage to a Canadian followed by her admission to Canada for permanent residence, both of which events occurred before she began to work as a public school teacher in the Province of Ontario. However, the record is devoid of

any substantial evidence that applicant at any time voluntarily relinquished her United States citizenship.

In applying the newly-announced constitutional requirement of "voluntary relinquishment" to the present case, it is not necessary to determine what the full reach of *Afroyim* may be, either in terms of its effect on each of the provisions of the present statute, or in terms of what kinds of conduct might validly be held to constitute voluntary relinquishment of United States citizenship.* In this case it is clear that the record does not show a voluntary relinquishment of United States citizenship.

Accordingly, the case is remanded to the Board of Immigration Appeals for disposition in conformity with this opinion.

---

*See footnote 1 of the dissenting opinion in *Afroyim*.