**ACHESON, Secretary of State, v. MAENZA.**

No. 11369.

United States Court of Appeals
District of Columbia Circuit.

Argued Nov. 7, 1952.

Decided Feb. 12, 1953.

---

1. 91 U.S.App.D.C. 344, 203 F.2d 20, 33. (Emphasis supplied).

454

Murry Lee Randall, Atty., Dept. of Justice, Washington, D. C., pro hac vice by special leave of Court, with whom Charles M. Irelan, U. S. Atty., Joseph M. Howard and William R. Glendon, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellant.

Charles R. Richey, Washington, D. C., for appellee.

Before CLARK, WILBUR K. MILLER and PROCTOR, Circuit Judges.

CLARK, Circuit Judge.

This action was brought by appellee under the Federal Declaratory Judgment Act[1] and under Section 503 of the Nationality Act of 1940[2] for a determination of his right to United States citizenship. An appeal was taken by the Government from a District Court judgment declaring that appellee "has been at all times since his birth and now is" a citizen and a national of the United States.

■■■ Appellee Rosario Maenza was born in Cleveland, Ohio, on July 29, 1912,

1. 62 Stat. 964 (1948), 28 U.S.C. § 2201 (Supp.1952), as amended, 63 Stat. 105 (1949).

2. 54 Stat. 1171 (1940), 8 U.S.C.A. § 903 (1946).

the son of alien Italian parents. Under familiar principles of international law and of the municipal law of the United States and of Italy, he possessed dual nationality from time of his birth; he was a citizen of the United States by virtue of nativity in this country, Amendment XIV, § 1, and a subject of the King of Italy because of his Italian parentage.[3] Appellee spent his childhood in Italy and it was not until 1925 that he was brought back to the United States to live with his father in Cleveland. In 1932, Mr. Maenza received a letter from the Italian government requesting him to report for duty with the armed forces of Italy but he was able to avoid military service by securing an exemption from the Italian consulate in Cleveland. The exemption was readily granted because it was not then the policy of the Italian authorities to insist on service by their nationals living abroad.

Several months later, at the height of the depression, appellee, finding it impossible to obtain gainful employment, decided to leave the United States and to return to Italy. He testified that it was his purpose to visit his grandmother there, apparently in the hope that she might support him on her farm. The Government contends, on the other hand, that it was his intention even at that time to enlist in the Italian army and there is some evidence to support the Government's view. However, when appellee did arrive in Italy, he did not volunteer for military service but instead retained his civilian status for a period of almost two years. He contacted the American consular authorities at least once during that time in an effort to obtain a passport and possibly funds for a return trip to the United States. On April 6, 1935, more than eighteen months after his arrival, Mr. Maenza was drafted into the armed forces of Italy pursuant to that country's universal military training and service law.

There is a great deal of confusion in appellee's testimony as to the actual circumstances surrounding his entry into service. He claims that before reporting for duty he made an effort to contact the American consulate in Palermo to enlist the aid of American authorities; he further asserts that he was forcibly thrust into military service by the Italian police and threatened with imprisonment in jail or in a concentration camp if he refused to obey the summons; and finally, he tells several conflicting stories as to whether he took an oath of allegiance to the King of Italy, and if so, whether such oath was the result of coercion. At the trial, appellee testified that he never pledged allegiance to Italy, explaining that it was customary to administer the oath to all recruits in a body at the time of the organization of the regiment: since he initially refused to report for duty he arrived at his unit too late for the swearing-in ceremonies.

After discharge from the army on September 19, 1936, appellee again visited the American Consulate in Palermo seeking a passport for return to the United States but the consulate refused to issue any travel papers to him on the ground that he had expatriated himself by taking an oath of allegiance to a foreign state. Thereafter, he again served on three occasions in the Italian armed forces: in 1939, in 1940, and from 1941 to 1943.

The Government urges that appellee became expatriated either under the Expatriation Act of March 2, 1907,[4] by taking an oath of allegiance to the State or the King of Italy when he joined the Italian army in 1935; or under the Nationality Act of 1940,[5] by serving in the armed forces of Italy after the effective date of that statute. The court below made no express finding with respect to the first alleged expatriating act beyond the oral statement that the Government had failed to sustain the burden of proof required of it

---

3. In the United States, nationality may be predicated either on *jus soli* (place of birth determines nationality) or on *jus sanguinis* (nationality of the child depends on the nationality of the parents); in Italy, *jus sanguinis* applies. Thus, appellee automatically became a citizen of the United States under *jus soli* and a national of Italy under *jus sanguinis*.

4. 34 Stat. 1228 (1907).

5. 54 Stat. 1168 (1940), 8 U.S.C.A. § 801 (c) (1946).

on this issue. The trial court did find specifically that appellee was conscripted and inducted into the Italian army and it concluded as a matter of law that the involuntary nature of such conscription precluded his losing United States citizenship on that ground.

We will deal first with the problem presented by the alleged oath of allegiance which was particulary stressed by the parties on this appeal. Section 2 of the Expatriation Act of 1907, provided that " * * any American citizen shall be deemed to have expatriated himself * * * when he has taken an oath of allegiance to any foreign state". The Government relies primarily on two facts to buttress its contention that appellee in fact took the oath required under the statute. It is asserted (1) that appellee stated in a sworn Application for Certificate of Identity which he executed in 1950 to secure admission to the United States that he was "forced to take some kind of oath" in connection with his military service, and (2) that the Italian Regulations of Military Discipline of December 2, 1872—which presumably were still in effect in 1935—required all persons entering the army to pledge loyalty to the King of Italy and to the laws of the State.

■ Appellant's argument fails to take account of the degree of proof required of the Government in a case of this character. American citizenship is perhaps the most precious right known to man today; it is not easily granted nor should it be lightly taken away. In denaturalization cases, the Government has always been held to a strict degree of proof; it is usually required to prove its case by clear, unequivocal and convincing evidence, not by a bare preponderance which leaves the issue in doubt. Knauer v. United States, 1946, 328 U.S. 654, 66 S.Ct. 1304, 90 L.Ed. 1500; Baumgartner v. United States, 1944, 322 U.S. 665, 64 S.Ct. 1240, 88 L.Ed. 1525; Schneidman v. United States, 1943, 320 U.S. 118, 125, 63 S.Ct. 1333, 1336, 87 L.Ed. 1796. We can see no reason for imposing a lighter

burden on the Government if it seeks to show the expatriation of a native-born citizen. Certainly the annihilation of the right is equally disastrous to the person affected in one case as in the other. Cf. Bauer v. Clark, 7 Cir., 1947, 161 F.2d 397.

■ Here, the trial court held the Government to no more than the burden of proving its case by a preponderance of the evidence and it found that there had been a failure to carry such burden. The record fully sustains the District Court's conclusion. Appellee's admission that he was forced to take "some kind of oath" does not indicate compliance with the statutory command that the alleged expatriate take an "oath of allegiance". In the first place (as we shall develop in somewhat more detail below) expatriation can be accomplished only by a voluntary act. Were we to accept appellee's statement that he took an oath in connection with his army service, we might also give credence to the amplification that he was compelled to do so, particularly since the Government failed to introduce any evidence to contradict or negative appellee's assertion.[6] In any event, the statute does not impose the condition that *an oath* be taken or *some kind of oath* but that the citizen to be pronounced expatriate take an *oath of allegiance*. Nothing in appellee's admission or the Government's explanations indicates that the oath taken by appellee, if any, was of the quality required by the Act. The 1872 Military Regulations which were introduced to cure this fatal weakness in the Government's case merely add an element of conjecture and speculation to a field where proof is required. No substantial evidence was forthcoming that the regulations were still in effect when appellee entered the army or that appellee complied with them even if they were still applicable. There must be more than inference, hypothesis or surmise before a natural-born citizen of the United States can be stripped of his rights and privileges of citizenship and be adjudicated an expatriate.

6. The Attorney General of the United States recognized the possibility of coercion in an opinion dated May 8, 1951 (41 Op.Atty.Gen. No.16) wherein he stated that "the choice of taking an oath or violating the law was, for a soldier in the army of Fascist Italy, no choice at all".

While we are not unaware of the rule that the spirit and meaning of the oath is decisive rather than its form,[7] and while we are fully cognizant of the fact that the Government is faced with considerable difficulties in obtaining the necessary proof in cases of this kind, still, there can be no waiver of the requirement of competent evidence of the taking of an oath which has the quality and the dignity of an oath of allegiance and is thus incompatible with the duties and obligations imposed by American citizenship. On a review of all the facts the court below was not persuaded, and neither are we, that appellee actually took such an oath.

The second alleged expatriating act is appellee's service in the Italian army. Section 401 of the Nationality Act of 1940[8] provides in pertinent part: "A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by: * * * (c) Entering, or serving in, the armed forces of a foreign state unless expressly authorized by the laws of the United States, if he has or acquires the nationality of such foreign state". Thus, from 1940 on, foreign army service alone was sufficient to deprive a United States citizen of his nationality; an oath of allegiance was no longer necessary. It is clear, however, that there can be no expatriation unless there is a voluntary act by which the citizen indicates relinquishment of his American nationality in favor of allegiance to some foreign state or potentate. See Perkins v. Elg, 1939, 307 U.S. 325, 334, 59 S.Ct. 884, 889, 83 L.Ed. 1320. The State Department took the same view, at least with respect to expatriation by naturalization in a foreign state, in the course of an instruction of March 16, 1934, to the Consul General at Bucharest: "The Department's position consistently followed over a period of many years is that an American citizen should not be considered as having been expatriated * * * by being naturalized in a foreign State * * unless the naturalization is the result of a distinctly voluntary act * * *" (or by ratification).[9]

While it is by no means certain that Congress would have the power to deprive a natural-born citizen of his American nationality if the citizen himself does not voluntarily renounce his citizenship by some act utterly inconsistent with his American allegiance,[10] we are convinced from a study of the legislative history that Congress had only *voluntary* army service in mind when it adopted Section 401(c) of the Nationality Act in 1940.[11]

The parties to this litigation, in measuring the facts of the case against the concept of voluntariness of choice—which we hold to be an essential element—took rather extreme positions. It is the Government's basic contention that since appellee voluntarily subjected himself to Italian military jurisdiction by entering Italy of his own free will in 1933, he was barred thereafter from claiming that his subsequent army service was involuntary and the result of duress. On the other hand, the core of appellee's argument lies in the assertion that coercion and unwillingness to serve are proved by the mere showing of induction under a conscription law. Neither of these sweeping views is justified.

To follow appellee's view would be largely to nullify the Congressional mandate, for it is an undeniable fact that today military service pursuant to a system of conscription or some variant of universal military training is the rule rather than the exception in almost all foreign countries. Consequently, were we to espouse the theory urged upon us by appellee, no one—except only those few whose voluntary en-

---

7. Secretary of State Hughes' letter of March 17, 1924 to Frank L. Polk, as quoted in Hackworth, Digest of International Law 219 (1940).

8. Supra note 5.

9. 3 Hackworth, Digest of International Law 209 (1940).

10. See United States v. Wong Kim Ark, 1897, 169 U.S. 649, 703, 18 S.Ct. 456, 477, 42 L.Ed. 890; Ex parte Griffin, D.C.N.D. N.Y., 1916, 237 F. 445, 453.

11. An excellent discussion of the legislative history of that section of the statute will be found in Dos Reis ex rel. Camara v. Nicolls, 1 Cir., 1947, 161 F. 2d 860.

listment could be proved and those serving in the comparatively rare units comparable to our National Guard—would fall within the orbit of Section 401(c). Congress cannot have intended to permit almost every foreign serviceman to escape the impact of the statute. Moreover, there can be no doubt that military service is frequently performed willingly, freely, even voluntarily, although technically there is no enlistment but conscription under a "compulsory" service law.[12] We are not ready to believe that everyone inducted into an army, a navy, or an air force, performs his service solely because of the proximity of the court martial or the police station. Duress cannot be inferred from the mere fact of conscription.

If, on the other hand, we were to adopt the reasoning urged upon us by the Government; i. e., that appellee might and should have known when he went to Italy that he would be drafted at some future date, and that he is therefore responsible for all the consequences of his original voluntary act, including those which were unintended and perhaps unforeseen, we would, in effect, be enjoining the foreign travels of dual nationals, and perhaps of all other American citizens. For their American citizenship would then be wholly at the mercy of the military authorities of whatever foreign state chose to impress them into their armed forces. We have no indication that Congress intended to accomplish such a result.[13] On the contrary, the Supreme Court in the recent case of Mandoli v. Acheson, 1952, 344 U.S.

133, 73 S.Ct. 135, again emphasized that even extremely prolonged foreign residence by a dual national, followed by foreign military service,[14] does not in itself deprive an American citizen of his citizenship rights.

We think this type of case cannot simply be decided either by proof that the citizen voluntarily entered the foreign state (even the one of which he is a national) which subsequently drafted him, or by evidence that his foreign army service occurred pursuant to a draft law. The additional factors of actual, in fact, duress and coercion at the time of the conscription, on the one hand and of a free exercise of the will and of the mind, on the other, must bear heavily on the eventual answer. In other words, there must be consideration of the circumstances attending the service in the foreign army, and the reasonable inferences to be drawn therefrom. Kiyokuro Okimura v. Acheson, 1952, 342 U.S. 899, 72 S.Ct. 293.; Hisao Murata v. Acheson, 1952, 342 U.S. 900, 72 S.Ct. 294.

 The pertinent facts shows that appellee resided in Italy in a civilian capacity for almost two years before he was drafted the first time; that he was inducted under a compulsory military service law; that the army service relied upon to prove expatriation occurred more than eight years after his arrival in Italy; and that such service took place after the American consulate had, erroneously,[15] refused to issue a passport for return to the United States. Appellee's evidence that he objected vigorously when he was originally conscripted,

12. For a similar view, see the dissent of Mr. Justice Douglas in Mandoli v. Acheson, 1952, 344 U.S. 133, 139, 73 S.Ct. 135, 138.

13. We recognize that Section 402 of the Nationality Act of 1940, 8 U.S.C.A. § 802, contains a presumption of expatriation in the case of a dual national who serves in a foreign army and who resides for more than six months in the country of his foreign nationality; but such presumption cannot and does not destroy the basic requirement of voluntariness of the army service. See Tomaya Kawakita v. United States, 1952, 343 U.S. 717, 72 S. Ct. 950, 96 L.Ed. 1249.

14. The Government in the Mandoli case abandoned the military service argument before the Supreme Court on the strength of 41 Op.Atty.Gen. 16, but there is no doubt that the Court could have considered it, as well as the oath of allegiance problem, since both appear in the record. See Mr. Justice Douglas' dissent.

15. Erroneous advice of the State Department may have a bearing on the factor of existence or non-existence of free choice. Podea v. Acheson, 2. Cir., 1949, 179 F.2d 306.

to the point of seeking to enlist the aid of American authorities and to the extent that force had to be used to remove him to his training camp, was uncontradicted at the trial. That testimony must be considered in connection with the well-known ruthlessness of the Fascist regime which, even as early as 1935, would hardly have tolerated resistance to its draft laws by an admitted national of Italy. Surely, the outbreak of the war, with its attendant wave of emotionalism and chauvinism in Mussolini's Italy, would have rendered further opposition to military service not only futile and unavailing but exceedingly dangerous to the safety and perhaps the life of the person voicing such opposition. The law does not exact a crown of martyrdom as a condition of retaining citizenship. Tomasicchio v. Acheson, D.C.1951, 98 F.Supp. 166, 174.

Under those circumstances, we are not prepared to hold that the voluntary act of travel to Italy is determinative as a matter of law of the question of voluntariness of appellee's subsequent army service. Rather, the inference to be drawn from the evidence is that appellee did not of his own free will serve in the army of a foreign state. In view of the fact that the Government failed to sustain the burden of proof on either of the two alleged grounds of expatriation, we must conclude that appellee never lost American citizenship.

Affirmed.