**Sophie Anna PETER, Plaintiff,**

v.

**The SECRETARY OF STATE,
Defendant.**

**Civ. A. No. 927–72.**

United States District Court,
District of Columbia.

Sept. 15, 1972.

---

John J. Abt, New York City, and Joseph Forer, Washington, D. C., for plaintiff.

Lillian C. Scott, Atty., Dept. of Justice, for defendant, Secretary of State.

Before FAHY, Circuit Judge, and HART and RICHEY, District Judges.

RICHEY, District Judge:

This case is before us as a result of an action for mandamus, declaratory and injunctive relief. At the request of the plaintiff, a three-judge Court was convened pursuant to 28 U.S.C. §§ 2282 and 2284 (1970), to hear plaintiff's challenge to the constitutionality of an Act of Congress, namely, section 349(a)(4)(A) of the Expatriation Act of 1954, 8 U.S.C. § 1481(a)(4)(A) (1970). Plaintiff also prays for such other relief as may be appropriate under the circumstances of this case and particularly for an order striking the certificate of loss of plaintiff's American citizenship (nationality) issued by the defendant. Plaintiff also sues for a declaration that the defendant should be and is required to register plaintiff as an American citizen.

The plaintiff, Sophie Anna Peter, was born in Poland in 1906 and at the age of eight immigrated to the United States with her parents. In 1934, at the age of 28, she was naturalized as a United States citizen. Eight years later, she married Jozsef Peter, a Hungarian citizen. By operation of Hungarian Law, marriage to a Hungarian citizen she became also a Hungarian national, and thus she was possessed of dual nationality. In 1949, plaintiff joined her husband in Hungary on his return there from the United States, and she has resided there ever since.

Upon plaintiff's arrival in Hungary she registered with the Hungarian police

as an American citizen. On January 27, 1970, she applied at the United States Embassy at Budapest for registration as a United States citizen.[1]

On July 19, 1971, the United States Vice-Consul at Budapest notified plaintiff that the Department of State had made a preliminary decision "that you have expatriated yourself under section 349(a)(4)(A)" of the Immigration and Nationality Act, 8 U.S.C. § 1481(a)(4)(A) (1970), "by accepting a position with the Hungarian Radio in Budapest." [2] Upon contest of this preliminary decision, followed by a supplemental questionnaire in which plaintiff explained her employment by the Foreign Department of the Hungarian Radio, the Passport Office of the Department of State affirmed the preliminary finding and approved the certificate of plaintiff's loss of nationality. The certificate recites that plaintiff acquired Hungarian nationality by her marriage in 1942 to an Hungarian citizen, that she had accepted a position with the Hungarian Radio, a political subdivision of the Hungarian Government, and "that thereby she expatriated herself." On her appeal to it, the Board of Appellate Review of the Department of State, on April 13, 1972, affirmed the prior determination.

In Afroyim v. Rusk, 387 U.S. 253, 87 S.Ct. 1660, 18 L.Ed.2d 757 (1967), the Supreme Court considered the constitutionality of section 401(e) of the Na-

tionality Act, 8 U.S.C. § 1481(a)(5) (1970), which provides that a citizen of the United States shall lose his citizenship if he votes "in a political election in a foreign state." In reversing the decision of the Secretary of State that by such conduct Afroyim had lost his citizenship, the Court held that Congress has no power under the Constitution to divest a person of his United States citizenship. absent his voluntary renunciation thereof.

In affirming the prior determination the Board of Appellate Review in the present case recognized the necessity of applying section 349(a)(4)(A) in a manner consistent with the decision of the Supreme Court in Afroyim, as that section had been interpreted by the Attorney General of the United States in a Statement of Interpretation, 34 Fed.Reg. 79 (1969).

■ Having exhausted her administrative opportunities, as to which no question is raised, plaintiff instituted this suit. She challenges the constitutionality of the section relied upon, and as applied in her case, invoking, inter alia, the right of citizenship guaranteed by the Fourteenth Amendment, the Due Process clause of the Fifth Amendment, and the First Amendment protections securing freedom of speech and the press. The complaint also attacks the defendant's decision as unauthorized by the section relied upon, as construed by the Attorney General's Statement.[3] Sub-

1. Defendant's brief in support of his Cross Motion for Summary Judgment states that plaintiff's purpose in seeking registration was to enable her to receive United States Social Security benefits in Hungary, as is permissible under the Social Security Act if she retained her status as a citizen of the United States. 42 U.S.C. § 402(t) (1970).

2. The section referred to reads as follows:
(a) From and after the effective date of this chapter a person who is a national of the United States whether by birth or naturalization, shall lose his nationality by—
(4) (A) accepting, serving in, or performing the duties of any office, post, or employment under the government of a

foreign state or a political subdivision thereof, if he has or acquires the nationality of such foreign state . . .

3. The Statement was concerned with "the validity of expatriation provisions other than those relating to voting" and reads in part as follows:
For administrative purposes, and until the courts have clarified the scope of Afroyim, I have concluded that it is the duty of Executive officials to apply the Act on the following basis. "Voluntary relinquishment" is not confined to a written renunciation, as under Section 349(a)(6) and (7) of the Act, 8 U.S.C. 1481(a)(6) and (7). It can also be manifested by other actions declared to be expatriative un-

stantial constitutional questions are thus presented by the complaint, authorizing the convening of this three-judge court pursuant to 28 U.S.C. §§ 2282 and 2284 (1970). The case is before us on cross motions for summary judgment.

Assuming arguendo that the Attorney General's Statement of Interpretation of *Afroyim* to be correct, and that as so construed section 349(a)(4)(A) is constitutional, the proof fails to meet the burden which must be assumed by defendant; and this is no less clear if *Afroyim* is considered independently of the Statement. Since proof of voluntary renunciation is lacking we are not called upon to decide more.

■■ As our Court of Appeals said almost twenty years ago in Acheson v. Maenza, 92 U.S.App.D.C. 85, 202 F.2d 453, 456 (1953):

"American citizenship is perhaps the most precious right known to man today; it is not easily granted nor should it be lightly taken away. In denaturalization cases, the Government has always been held to a strict degree of proof; it is usually required to prove its case by clear, unequivocal, and convincing evidence, not by a bare preponderance which leaves the issue in doubt." Knauer v. United States, 1946, 328 U.S. 654, 66 S.Ct. 1304, 90 L.Ed. 1500; Baumgartner v. United States, 1944, 322 U.S. 665, 64 S.Ct. 1240, 88 L.Ed. 1525; Schneiderman v. United States, 1943, 320 U.S. 118, 125, 63 S.Ct. 1333, 1336, 87 L.Ed. 1796.

■ It is also clear that there can be no expatriation unless there is a voluntary act by which the American citizen

unequivocally indicates relinquishment of American nationality in favor of allegiance to some foreign state. Nishikawa v. Dulles, 356 U.S. 129, 135, 78 S.Ct. 612, 2 L.Ed.2d 659 (1958); Trop v. Dulles, 356 U.S. 86, 92, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958).

■ In 1949, when plaintiff joined her husband in Hungary, she registered with the Hungarian Police as an American citizen. In 1971 when she applied to the United States Embassy in Budapest to register as a citizen of the United States, in answering a questionaire under oath she stated that she had always considered herself an American citizen since her naturalization. It is true that in 1950 she was employed by Hungarian Radio, Budapest, first as a translator and in 1952 had charge of the English Language Broadcast Station, and that in about 1960 she was appointed deputy head of the foreign language department, resigning that position in 1965 and later that year retiring. But these facts do not support "by clear, convincing and unequivocal evidence," Nishikawa v. Dulles, *supra,* 356 U.S. at 135, 78 S.Ct. at 616, an inference of an intent to forfeit her American citizenship, or voluntarily to renounce it. Nor were these acts shown to be "so inconsistent with the retention of [American] citizenship as to result in the loss of that status." Perez v. Brownell, 356 U.S. 44, 68, 78 S.Ct. 568, 2 L.Ed.2d 603 (1958) (dissent of Chief Justice Warren cited in *Afroyim* with approval, *supra,* 387 U.S. at 256, n.7, 87 S.Ct. 1660, 18 L.Ed.2d 757) quoted by the Attorney General as controlling in the Statement of Interpretation, 34 C.F.R. 1079 (1969).

der the Act, if such actions are in derogation of allegiance to this country. Yet even in those cases *Afroyim* leaves it open to the individual to raise the issue of intent.

Once the issue of intent is raised, the Act makes it clear that the burden of proof is on the party asserting that expatriation has occurred. *Afroyim* suggests that this burden is not easily satisfied by the Government. In the words of Justice Black quoted above from his concurring opinion in *Nishi-*

*kawa,* [v. Dulles] [356 U.S. 129, 139 [78 S.Ct. 612, 2 L.Ed.2d 659] (1958)] the voluntary performance of some acts can "be highly persuasive evidence in the particular case of a purpose to abandon citizenship." Yet some kinds of conduct, though within the proscription of the statute, simply will not be sufficiently probative to support a finding of voluntary expatriation. [Footnotes omitted]
34 Fed.Reg. 1079–80 (1969).

The less so does the requisite support reside in her accompanying the Hungarian Radio Children's Choir on a tour of the United States in 1965 as interpreter and her participation in 1968 in a like tour to Japan as business manager. True, she travelled on Hungarian passports, but it is altogether possible that in the circumstances this was done as a matter of convenience rather than in derogation of her American citizenship for the record explicitly states that because of her dual nationality she was required to obtain an Hungarian passport. She travelled once again in 1970 to the United States to visit relatives, on an Hungarian passport. But it must be remembered that by her marriage to a national of Hungary she became a "dual citizen" of Hungary without thereby losing her American citizenship. All this evidence was, at best, equivocal.

It follows from *Afroyim* that holding the position she did in the Hungarian Government was not in and of itself a voluntary relinquishment or renunciation of her American citizenship. While the particular conduct upon which the defendant relies we assume was in all respects voluntary rather than coerced, it does not follow that this clothed the conduct with a voluntary act of expatriation, quite a different matter. As to this, the conduct fails to meet the standard imposed by the Attorney General's Statement of Interpretation—"a burden [on the government] not easily satisfied," "some kinds of conduct, though within the prescription of the statute, simply will not be sufficiently probative to support a finding of voluntary expatriation" nor does it meet the standards imposed by judicial decisions.

The three-judge court, having been properly convened by reason of the injunctive relief sought on the basis of the several challenges to the constitutionality of section 349(a)(4)(A), finds that the defendant has not sustained his burden of proof that plaintiff has voluntarily expatriated herself. Zemel v. Rusk, 381 U.S. 1, at 5–7, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965). See Townsend v. Swank, 404 U.S. 282, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971); and Florida Lime & Avocado Growers v. Jacobsen, 362 U.S. 73, at 80, and 84–85, 80 S.Ct. 568, 4 L.Ed.2d 568 (1960). And see Harris v. Louisiana State Supreme Court, 334 F.Supp. 1289, 1298–1299 (E.D.La. 1971); Socialist Workers Party v. Rockefeller, D.C., 314 F.Supp. 984, 996–997 (1970), affirmed 400 U.S. 806, 91 S.Ct. 65, 27 L.Ed.2d 38 (1970); Law Students Civil Rights Research Council, Inc. v. Wadmond, 299 F.Supp. 117, 128–129 (S.D.N.Y. 1969), affirmed 401 U.S. 154, 91 S.Ct. 720, 27 L.Ed.2d 749 (1970). Cf. Williams v. Osser, 326 F.Supp. 1139, 1140–1141 (E.D.Pa. 1971).

An appropriate Order is being this date entered in accordance with this Opinion.