**Laurence J. TERRAZAS,
Plaintiff-Appellant,**

v.

**Cyrus VANCE, Secretary of State,
Defendant-Appellee.**

**No. 77–2007.**

United States Court of Appeals,
Seventh Circuit.

Argued April 13, 1978.

Decided May 26, 1978.

Rehearing and Rehearing En Banc
Denied Aug. 24, 1978.

Kenneth K. Ditkowsky, Chicago, Ill., for plaintiff-appellant.

Thomas P. Sullivan, Michael Lee Diegel, U. S. Atty., Chicago, Ill., for defendant-appellee.

Before CASTLE, Senior Circuit Judge, and SWYGERT and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

The issue in this appeal is what standard of proof a district court should apply in deciding whether an individual voluntarily renounced his United States citizenship and thereby expatriated himself under 8 U.S.C. § 1481.

I

Plaintiff was born in Takoma Park, Maryland on December 13, 1947. His father was a citizen of Mexico and his mother was a citizen of the United States. Plaintiff, therefore, under the Fourteenth Amendment[1] and the laws of Mexico was at birth a citizen of *both* the United States and Mexico.

The events surrounding plaintiff's apparent expatriation transpired in 1970–71 while plaintiff was a student at the Colegio Comercial Ingles in Monterrey, Mexico. Plaintiff claims that he was told by an official of that college that a Certificate of Mexican Nationality was necessary as evidence of his citizenship which in turn was a requirement for graduation.[2] Thus, in September 1970, while plaintiff was in the United States for a Selective Service physical examination for possible induction in the army, his father procured an application for a Certificate which he instructed the plaintiff to sign.

On the application was printed in Spanish the following translated material:

---

1. Under the Fourteenth Amendment, "[a]ll persons born . . . in the United States . . are citizens of the United States."

2. There is a factual dispute as to whether plaintiff in fact was required to have a Certificate of Mexican Nationality in order to receive his degree. It appears that legally his Mexican iden-

tification card which he had acquired in 1966 would have sufficed. Nonetheless, plaintiff maintains that he was told differently by the College's officials and there is an affidavit in the record from one of those officials that appears to corroborate his statement.

I therefore hereby expressly renounce _____ citizenship, as well as any submission, obedience, and loyalty to my foreign government, especially to that of _____, of which I might have been subject, all protection foreign to the laws and authorities of Mexico, all rights which treaties or international law grant to foreigners; and furthermore I swear adherence, obedience, and submission to the law and authorities of the Mexican Republic.

Ultimately, the blanks were filled in with the Spanish equivalents of the words "United States" ("Estados Unidos") and "North America" ("Norteamericana"), respectively. Plaintiff, however, maintains that when he signed the application, none of the blanks were filled in and that he had no idea that he was renouncing his United States citizenship.

Plaintiff's application was sent to Mexico City and submitted by a brother of plaintiff's father to the Mexican government on November 16, 1970. On April 13, 1971, plaintiff was issued a Certificate of Mexican Nationality. Plaintiff used the Certificate to apply for a job as an insurance salesman in Mexico and to acquire a Mexican passport in order to return to the United States.[3] Plaintiff also acquired a Mexican social security card and he registered with the Mexican military. Neither of these acts, however, required plaintiff to have a Certificate or to be a Mexican national.

In August 1971, plaintiff went to the United States Consulate in Monterrey, Mexico because he had been told informally by a State Department employee that the Certificate may have affected his United States citizenship. At the Consulate plaintiff met with Wesley Parsons, the Chief of the Passport Citizenship Welfare Protection Whereabouts Unit which dealt with nationality cases. Plaintiff apparently asked Mr. Parsons about the legality of dual citizenship (Tr. at 173). Mr. Parsons explained that there was no legal impediment to dual citizenship, but that plaintiff must be careful not to acquire a Certificate of Mexican Nationality (Tr. at 177). When plaintiff informed Mr. Parsons that he had acquired such a Certificate, Mr. Parsons told him "as far as I am concerned, . . . you have expatriated yourself" (Tr. at 177).[4]

According to Mr. Parsons, plaintiff responded to this news with two distinct reactions. First, he was surprised to learn that he had lost his United States citizenship (Tr. at 262). Second, plaintiff asked Mr. Parsons to provide him with a letter informing his draft board in Chicago that he was no longer an American citizen (Tr. at 178).[5]

---

3. The passport was acquired after the Department of State determined that plaintiff had expatriated himself and it was done at the suggestion of plaintiff's lawyer. Plaintiff has resided in the United States since that time.

4. This legal conclusion was based on Mr. Parsons's experience in from three to five cases dealing with a Certificate of Mexican Nationality. Nonetheless, Mr. Parsons made no effort at the time to learn any facts surrounding the application for or the issuance of plaintiff's Certificate. It appears to us somewhat odd that so little effort was made by an official of the Department of State to protect plaintiff's citizenship.

We should note that there is a dispute as to whether Mr. Parsons told plaintiff that his acquisition of a Certificate of Mexican Nationality constituted an act of treason. Given our disposition of this case, we need not resolve this issue.

5. Plaintiff did submit a letter to Mr. Parsons on August 31, 1971, which informed plaintiff's draft board that he was no longer a United States citizen. Mr. Parsons repeated his statement that he lacked the authority to send such a letter because he was not empowered to make a final determination on plaintiff's citizenship. There was no evidence before the district court as to whether the letter or some other version of it was ever sent to the draft board.

Obviously, the government's view of this case is that plaintiff's actions regarding his Mexican and United States citizenship were motivated by his desire to avoid the draft. Although there was not a great deal of evidence on this question introduced at the trial before the district court, there was sufficient evidence from which such an inference could be drawn. We do note, however, in this regard that Mr. Parsons's assessment was that it did not appear to him that plaintiff "left the United States to evade or avoid military service" (Tr. at 179).

Mr. Parsons explained to plaintiff that he lacked the authority to make a final determination as to plaintiff's citizenship and that it would be necessary to "document this case"[6] by filing certain forms with the Department of State. To that end Mr. Parsons asked plaintiff to fill out various forms explaining the circumstances surrounding his acquisition of the Certificate of Mexican Nationality.

In November 1971, plaintiff returned to the Consulate with the various necessary documents to be included in his Application for Registration.[7] On one form, plaintiff responded "no" to the question: "Did you intend by this Oath, or affirmation, to abandon your allegiance to the United States, or transfer your allegiance to the foreign state?" In a separate statement drafted by plaintiff, he acknowledged that he felt "more Mexican than American," but nonetheless said that "[b]y taking this oath I did not consider that I was relinquishing my rights as an American citizen. . . ." In a third statement, also drafted by the plaintiff and submitted that same day, plaintiff, contrary to his other two statements, stated that he took the "oath of allegiance" voluntarily and "that it was done with the intention of relinquishing my United States citizenship." Except for this one statement, plaintiff has unswervingly contended in all other documents and testimony that he never intended to relinquish his United States citizenship when in April 1970 he signed the application for the Certificate of Mexican Nationality.

A Certificate of Loss of Nationality was approved by the State Department in December 1971. The day after it was mailed to plaintiff he called Mr. Parsons to find out "what he could do to reverse the proc-ess. . . . He wanted to regain his American nationality" (Tr. at 208). Mr. Parsons responded, "You have got to talk to the Department of State. Don't talk to me" (Tr. at 208).

Plaintiff did seek reinstatement of his citizenship by taking an appeal from the issuance of the Certificate of Loss of Nationality to the Board of Appellate Review of the Department of State. On April 29, 1975, following a full hearing, that body affirmed the administrative finding of plaintiff's expatriation, and denied plaintiff's application for a United States passport.

Plaintiff instituted this action against the Secretary of State, seeking the issuance of a passport and a declaration of his United States citizenship, pursuant to 8 U.S.C. § 1503(c). After a three-day bench trial, the district court found for the Secretary-defendant and held that the denial of plaintiff's application for a passport by reason of expatriation was proper. Plaintiff appeals that judgment and our jurisdiction derives from 28 U.S.C. § 1291.

## II

The district court in its memorandum decision applied the burden of proof standards created in 8 U.S.C. § 1481(c), which require the government to prove that plaintiff has taken an oath, made an affirmation or declared his allegiance to Mexico by a "preponderance of the evidence." If the government satisfies its burden, then the statute presumes that plaintiff acted voluntarily unless he can prove by a preponderance of the evidence that his actions were involuntary. See King v. Rogers, 463 F.2d 1188, 1189 (9th Cir. 1972).

---

6. It is not altogether clear that Mr. Parsons's efforts to "document this case" were motivated by plaintiff's concern about the draft. Even without plaintiff's concern, Mr. Parsons still had a duty to submit to the State Department a report on any apparent case of expatriation (Tr. at 164). See 8 U.S.C. § 1501.

7. It is less than clear whether plaintiff knew at the time he was asked to fill out these documents that he was making in essence an application for a Certificate of Loss of Nationality.

It was described to him as a "determination as to whether or not he had expatriated himself" (Tr. at 283).

In filling out these documents, plaintiff was assisted by Mr. Parsons's secretary or assistant, Maria Ibarra. There is some dispute as to whether some of her suggested changes injured plaintiff's chances of retaining his citizenship. Given our disposition of this case, however, we need not resolve that dispute.

The district court in applying those standards to this case found that the government proved that plaintiff had declared his allegiance to Mexico by the preponderance of the evidence. In addition, the court concluded that plaintiff's evidence was insufficient to rebut the presumption of voluntariness. Assuming that the proper standards were applied, we are convinced that the record fully supports the court's findings. Therefore, it is necessary for us to evaluate the constitutional appropriateness of section 1481(c).

In considering the constitutionality of that provision our analysis must begin with the Supreme Court's opinion in *Afroyim v. Rusk*, 387 U.S. 253, 87 S.Ct. 1660, 18 L.Ed.2d 757 (1967). In *Afroyim*, the Court held unconstitutional section 1481(a)(5), which made voting in a political election of a foreign state an expatriating act. In so holding, the Court reasoned that the Fourteenth Amendment protects "every citizen of this Nation against a congressional forcible destruction of his citizenship." [8]  *Id.* at 268, 87 S.Ct. at 1668. Therefore, in the Court's view every citizen has "a constitutional right to remain a citizen" of this country "unless he *voluntarily* relinquishes that citizenship." *Id.* (emphasis added).[9]

In light of the Court's holding in *Afroyim* that Congress is constitutionally devoid of the power to impose expatriation on a citizen, the issue becomes whether Congress nonetheless retains the power to legislate as to the evidentiary standard for voluntariness or whether instead that term must be defined constitutionally. It seems to us absolutely inconsistent with the spirit of *Afroyim* to conclude that Congress somehow retains the power to define in the way it has here the conditions under which an individual is said to have relinquished voluntarily that citizenship.

In fact, the legislative history surrounding section 1481 demonstrates that Congress recognized that the citizen's ability to retain his citizenship can be very much a function of the standard of proof. Congress lowered the standard to a preponderance of the evidence because it felt that there were individuals who should be expatriated but who were avoiding that result in administrative proceedings where the stricter standard was being applied. H.R. Rep. No. 1086, 87th Cong., 1st Sess., *reprinted in* (1961) U.S.Code Cong. & Admin.News pp. 2950, 2984. It seems to us that to adopt blindly Congress's judgment on the burden of proof as to expatriation would be to grant indirectly to Congress power over an individual's citizenship that *Afroyim* held that it could not exercise directly.[10] We decline to sanction such a result.

---

**8.** In so holding the Court overruled its previous decision in *Perez v. Brownell*, 356 U.S. 44, 78 S.Ct. 568, 2 L.Ed.2d 603 (1958), in which the Court held that Congress had the power to remove an individual's citizenship based on "its power to regulate foreign affairs." *Id.* at 57, 78 S.Ct. at 575.

The Court in *Afroyim* rejected the idea that Congress had some implied power to tamper with an individual's citizenship. Instead, it relied on Chief Justice Warren's dissent in *Perez* in which he concluded that "[u]nder our form of government, as established by the Constitution, the citizenship of the lawfully naturalized and the native-born cannot be taken from them." 356 U.S. at 66, 78 S.Ct. at 580.

**9.** The Court's holding in *Afroyim* was reaffirmed recently in *Rogers v. Bellei*, 401 U.S. 815, 91 S.Ct. 1060, 28 L.Ed.2d 499 (1971), where the Court held that Congress could regulate the citizenship of an individual born in a foreign country to parents one of whom is an alien, and the other a citizen of the United States. In so holding the Court distinguished *Afroyim* as being based on the Fourteenth Amendment. The *Bellei* Court recognized that in such a case "Congress has no 'power, express or implied, to take away an American citizen's citizenship without his assent.'" 401 U.S. at 835, 91 S.Ct. at 1071.

**10.** The Court in *Afroyim* quoted Congressman Lowndes's remarks in 1818 made in response to a proposal for the establishment of some means for voluntary expatriation. Those comments seem particularly apt as applied to this case.

> If you pass this bill, . . . you have only one step further to go, and say that such and such acts shall be considered as presumption of the intention of the citizen to expatriate, and thus take from him the privileges of a citizen. . . . [Q]uestions affecting the right of the citizens were questions to be regulated, not by the laws of the General or State Governments, but by Constitutional provisions.

The issue, of course, remains as to what standard of proof is constitutionally required. In making that determination it is important to recognize that "[t]he standard of proof is more than an empty semantic exercise; it reflects the value society places" on the specific interest at stake. *Tippett v. State of Maryland*, 436 F.2d 1153, 1166 (4th Cir. 1971) (Sobeloff, J., dissenting). Seen from that perspective, we conclude that the government must prove by clear, convincing and unequivocal evidence that plaintiff's renunciation of his United States citizenship was performed voluntarily.

We reach that conclusion for several reasons. First, a clear and convincing evidence standard was the test adopted by the Supreme Court in *Nishikawa v. Dulles*, 356 U.S. 129, 133–36, 78 S.Ct. 612, 2 L.Ed.2d 659 (1958), prior to Congress's amendment of the statute. *See also Berenyi v. District Director, INS*, 385 U.S. 630, 636, 87 S.Ct. 666, 17 L.Ed.2d 656 (1967) (dicta). While it is not clear that the Court derived that standard from the Constitution, it is clear that it was not statutorily mandated. As the Court noted, "there is no discussion of the problem of the burden of proof" in the legislative history of the Act it was considering, 356 U.S. at 135, 78 S.Ct. at 616. Thus, regardless of its source, the clear, convincing and unequivocal evidence standard represented the Court's view of the

burden of proof that best protected the individual's substantial interest in his or her citizenship.[11]

Second, most of the lower court decisions subsequent to *Afroyim* have employed the clear, convincing and unequivocal evidence standard. *See, e. g., United States v. Matheson*, 532 F.2d 809, 818 (2d Cir. 1976); *Peter v. Sec'y of State*, 347 F.Supp. 1035, 1038 (D.D.C.1972) (three judge court). *But see King v. Rogers*, 463 F.2d 1188, 1189 (9th Cir. 1972) (no discussion of the issue). In fact, the *Matheson*, decision is essentially indistinguishable from this case.[12] There, the Second Circuit refused to hold that an American citizen had relinquished voluntarily her citizenship by taking an oath of allegiance to Mexico. The court held that specific intent to renounce U.S. citizenship proved by clear, convincing and unequivocal evidence was required before the mere taking of an oath of allegiance could result in an individual's expatriation. We find no basis for disagreeing with that conclusion.

Finally, we believe that the stricter standard of proof best reflects the paramount importance of the individual's interest in United States citizenship. The court in *Matheson* described that interest as follows:

> An individual denied his or her United States citizenship, even if permitted entry into the country, is denied effective participation in our country's electoral

387 U.S. at 260, 87 S.Ct. at 1664 (quoting 31 Annals of Cong. 1050–51 (1818)).

11. The Supreme Court in *Berenyi v. District Director, INS*, 385 U.S. 630, 87 S.Ct. 666, 17 L.Ed.2d 656 (1967), a case subsequent to Congress's amendment to the statute, stated in dicta that "[w]hen the Government seeks to strip a person of citizenship already acquired . . . it carries the heavy burden of providing its case by 'clear, unequivocal and convincing evidence.'" *Id.* at 636, 87 S.Ct. at 670 (footnotes omitted).

12. The government attempts to distinguish *Matheson* on the basis that the oath involved in that case did not contain the explicit renunciatory language involved in the oath signed by plaintiff in this case. The problem with this distinction is that plaintiff claims that since there were blanks in the oath he did not know that he was renouncing his United States citizenship. In fact, he consistently has made that

claim in all documents and testimony with the exception of the one affidavit. Thus, to the extent that there is a distinction between *Matheson* and this case, it is predicated on a factual question that must be resolved under a standard different from that used by the district court.

We note also that the *Matheson* case involved the government as plaintiff seeking to acquire taxes from a citizen-defendant whose estate claimed that she had expatriated herself and thus was not subject to taxes as a United States citizen. We do not find the unusual posture of that case to have any bearing on the relevance to this case of that court's analysis of the requirements for expatriation. It would truly be a sad state of affairs if the government's view of an individual's ability to retain his citizenship was based on his potential tax liability to this country.

processes . . . which is ordinarily regarded as a fundamental constitutional interest, as well as access to a range of livelihoods and positions opened only to citizens of this country.

532 F.2d at 815 (citations omitted). Similarly, the court in *Peter* recognized that American citizenship is "perhaps the most precious right known to man today." 347 F.Supp. at 1038.

These are not mere idle expressions of patriotism. Rather, they represent judicial recognition that the benefits to the individual of our democratic society are predicated on citizenship. Seen in this way, it is difficult to imagine a commodity more precious to all individuals born or naturalized in this country. Perhaps Chief Justice Warren expressed the view most eloquently:

> Citizenship *is* man's basic right for it is nothing less than the right to have rights. Remove this priceless possession and there remains a stateless person, disgraced and degraded in the eyes of his countrymen.

*Perez v. Brownell,* 356 U.S. at 64, 78 S.Ct. at 579.

In searching for a standard of proof to be employed in determining whether an individual has voluntarily relinquished this valuable interest in citizenship, we should be mindful of Justice Harlan's statement that "a standard of proof represents an attempt to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *In re Winship,* 397 U.S. 358, 370, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring). The Supreme Court itself has made clear society's view on this issue; when citizenship is at stake, we must be particularly cautious to guarantee that ambiguities in the evidence are resolved in favor of citizenship. *See Nishikawa, supra,* 356 U.S. at 136, 78 S.Ct. 612.

A clear, convincing and unequivocal evidence standard is the minimum burden of proof that can satisfactorily guarantee that the individual's interest in the retention of his citizenship is protected adequately. *But cf. Nishikawa, supra,* 356 U.S. at 139, 78 S.Ct. 612 (Black & Douglas, JJ., concurring) (requiring a full judicial trial prior to expatriation). We therefore conclude that the Fourteenth Amendment requires the government to prove by clear, convincing and unequivocal evidence that plaintiff voluntarily relinquished his United States citizenship.

Since the district court applied an incorrect standard of proof, we must reverse its decision and remand the case back to that court for further proceedings. In remanding this case to the district court, however, we are not necessarily requiring that court to conduct a new trial. We recognize that there already have been two full evidentiary hearings in this case—one before the court and the other before the Department of State—and that the government's witnesses are probably scattered throughout the world. Thus, a new trial may constitute an undue burden on the government. On the other hand, credibility is a crucial factor in this case, and thus the court as trier of fact may be unable to reach a satisfactory decision based on the testimony contained in a two-year-old transcript. We believe the district court is in the best position to evaluate these countervailing considerations and determine in its discretion whether a new trial or a review of the record based on the new, stricter standard of proof will best serve the ends of justice. *See* 28 U.S.C. § 2106; *Panama Mail Steamship Co. v. Vargas,* 281 U.S. 670, 672, 50 S.Ct. 448, 74 L.Ed. 1105 (1930). We therefore remand to the district court for further proceedings consistent with this opinion.[13]

REVERSED and REMANDED.

---

**13.** Plaintiff complains about the admission of certain documents into the record by the district court. While we have some difficulty pinpointing plaintiff's assignment of error, we have scrutinized the record and found not the slightest error in the district court's procedure for admitting the large number of exhibits involved at the trial. On remand, therefore, the district court may consider all documents that were admitted in the original trial.

Plaintiff, in a footnote in his brief, mentions that he is appealing from the district court's

denial of his motion for leave to appeal in
forma pauperis under 28 U.S.C. § 1915. Plain-
tiff, however, presents no arguments suggest-
ing how the district court abused its discretion,
see *Brewster v. North American Van Lines,
Inc.,* 461 F.2d 649, 651 (7th Cir. 1972), in deny-
ing plaintiff's motion. Moreover, nothing in
the record casts any doubt on the propriety of
the district court's decision. We therefore af-
firm the order denying plaintiff's motion to
appeal in forma pauperis.